**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JAVON MARSHALL, STEVEN CLARKE,** | ) | |
| **CHRIS CONNER, PATRICK MILLER,** | ) | |
| **BYRON MOORE, CHAZ MOORE,** | ) | |
| **SEAN PARKER, ERIC SAMUELS,** | ) | |
| **MARLON WALLS, and ROD WILKS,** | ) | |
| individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | **CLASS ACTION COMPLAINT** |
| **ESPN INC.; CBS BROADCASTING, INC.,** | ) | **JURY DEMAND** |
| **NATIONAL BROADCASTING COMPANY** | ) | |
| **INC.; ABC, INC.; FOX, INC.;** | ) | |
| **IMG COLLEGE, LLC; ATLANTIC COAST** | ) | |
| **CONFERENCE; BIG TEN CONFERENCE;** | ) | |
| **BIG 12 CONFERENCE; PACIFIC-12** | ) | |
| **CONFERENCE; SOUTHEASTERN** | ) | |
| **CONFERENCE; CONFERENCE USA;** | ) | |
| **OHIO VALLEY CONFERENCE;** | ) | |
| **BIG EAST CONFERENCE; IMG** | ) | |
| **WORLDWIDE, INC.; IMG COLLEGE, LLC;** | ) | |
| **BIG TEN NETWORK SERVICES, LLC;** | ) | |
| **CBS COLLEGIATE SPORTS** | ) | |
| **PROPERTIES, INC.;  JMI SPORTS LLC;** | ) | |
| **TELESOUTH COMMUNICATIONS, INC.,** | ) | |
| **T3 MEDIA, INC.; ESPN INC. D/B/A SEC** | ) | |
| **NETWORK; SOUTHEASTERN** | ) | |
| **CONFERENCE D/B/A SEC NETWORK;** | ) | |
| **ESPN INC. D/B/A LONGHORN NETWORK;** | ) | |
| **IMG COLLEGE, LLC D/B/A LONGHORN** | ) | |
| **NETWORK; LEARFIELD SPORTS LLC;** | ) | |
| **WILLIAM MORRIS ENDEAVORS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**CLASS ACTION COMPLAINT**

---

{01140122.1 }

## INTRODUCTION

Plaintiffs, on behalf of themselves and the proposed Class of all other current and former players at the Football Bowl Subdivision ("FBS") and NCAA Division I Men's basketball level (collectively "Student Athletes"), by and through undersigned counsel, file this Class Action Complaint against specific defendants who have profited from the broadcast and use of Student Athletes' names, likenesses and images without the Student Athletes' permission. The defendants – broadcasters, athletic conferences and licensing entities – have conspired with each other and the NCAA to promulgate, enforce, adopt, implement and/or exploit rules that are inherently anticompetitive in forbidding Student Athletes from competing in the marketplace for the value of their rights of publicity. The alleged "release" that the Student Athletes are forced to sign as a condition of playing football or basketball in college is void as a matter of public policy, unconscionable, and vague, and therefore void and/or unenforceable. The defendants' actions constitute violations of the Student Athletes' rights of publicity, violations of the Sherman Act (antitrust) and violations of the Lanham Act (false endorsement), thereby unjustly enriching the defendants in the amount of billions of dollars, all to the detriment of the Student Athletes.

## NATURE OF THE ACTION

1.      This suit arises out of the deliberate and unlawful use of NCAA Division I Men's Basketball Student Athletes' names, images, and likenesses in advertisements and airings produced and televised by Defendants ESPN Inc. ("ESPN"); CBS Broadcasting, Inc. ("CBS"); National Broadcasting Company, Inc. ("NBC"); ABC, Inc. ("ABC"); and FOX, Inc. ("FOX") (hereinafter collectively referred to as "Broadcast Defendants").

{01140122.1 }

2

2.      This suit also arises out of the deliberate and unlawful licensing of FBS football and NCAA Division I Men's Basketball Student Athletes' names, images, and likenesses by Defendants IMG Worldwide, Inc. ("IMG Worldwide"); IMG College, LLC ("IMG College"); Big Ten Network Services, LLC ("Big Ten Network"); CBS Collegiate Sports Properties, Inc. ("CBS Collegiate Sports Properties"); JMI Sports, LLC ("JMI Sports"); Telesouth Communications, Inc. ("Telesouth"); T3 Media, Inc. ("T3 Media"); ESPN INC. d/b/a SEC Network ("SEC Network"); SEC d/b/a SEC Network ("SEC Network"); ESPN d/b/a Longhorn Network ("Longhorn Network"); IMG College d/b/a Longhorn Network ("Longhorn Network"); William Morris Endeavors, LLC ("William Morris Endeavors"); and Learfield Sports, LLC ("Learfield Sports") (hereinafter collectively referred to as "Licensing Defendants").

3.      This suit also arises out of the deliberate and unlawful licensing and use of FBS football and NCAA Division I Men's Basketball Student Athletes' names, images, and likenesses by Defendants the Atlantic Coast Conference ("ACC"); the Big Ten Conference ("Big Ten"); the Big 12 Conference ("Big 12"); the Pacific-12 Conference ("Pac-12"); the Southeastern Conference ("SEC"); the Big East Conference ("Big East"); Conference USA; and the Ohio Valley Conference ("OVC") (hereinafter collectively referred to as "Conference Defendants").

4.      Plaintiffs bring this action on behalf of themselves, and other similarly situated current and former FBS football and NCAA Division I basketball Student Athletes who have been foreclosed from the market for the licensing, use, and sale of their names, images, and likenesses.

5.      Defendants' collective action of excluding Student Athletes from the marketplace of their own names, images, and likenesses has caused the unlawful result of fixing the amount that current and former Student Athletes are paid for the licensing and sale of their names, images, and likeness at zero or, at most, their "cost of attendance. ("Cost of attendance" is herein defined

as the total cost of attending college, including tuition, fees, room, board, books and supplies, transportation, and miscellaneous expenses.)

6.      Defendants' use of Student Athletes' names, images, and likenesses is unauthorized because Student Athletes have not legally assigned their publicity rights to Defendants, the NCAA, or third parties acting on behalf of the NCAA.

7.      As alleged below, the waiver Student Athletes are required to sign (Form 08-3a) is the linchpin of Defendants' unlawful conduct and is invalid or otherwise unenforceable.

8.      Broadcast Defendants have conspired to fix the amount Student Athletes are paid for the licensing, use, and sale of their names, images, and likenesses at zero or, at most, a portion of the cost of attendance, by colluding with the NCAA and Conference Defendants. Broadcast Defendants, to their own commercial advantage, refuse to negotiate or enter into contracts with Student Athletes.  In so doing, Broadcast Defendants have adopted and implemented the restrictive bylaws and rules of the NCAA and Conference Defendants.

9.      Licensing Defendants have conspired to fix the amount Student Athletes are paid for the licensing, use, and sale of their names, images, and likenesses at zero or, at most, a portion of the cost of attendance, by colluding with the NCAA and Conference Defendants.  Licensing Defendants refuse to negotiate or enter into contracts with Student Athletes. In so doing, Licensing Defendants have adopted and implemented the restrictive rules and bylaws of the NCAA and Conference Defendants.

10.      The conspiracy between and among the Broadcast Defendants, Licensing Defendants, Conference Defendants and the NCAA has created a marketplace resembling a plantation type arrangement where Defendants financially benefit in the collective amount of billions of dollars, while Student Athletes, the driving force of college sports, receive nothing more than their cost

of attendance. This conspiracy has created an anticompetitive marketplace in which all Defendants commercially exploit the substantial value of each Student Athletes' images.

## **PLAINTIFFS**

11.     Plaintiff Javon Marshall currently lives in Nashville, Tennessee. Mr. Marshall played on the Vanderbilt University football team in the 2010, 2011, 2012, and 2013 seasons. Over the course of his celebrated career at Vanderbilt, Mr. Marshall saw extensive playing time in many primetime matchups before a national audience. He started in every game of his junior and senior years as a defensive back. Mr. Marshall led the team with 58 solo tackles and 80 total tackles in 2012 and played against North Carolina State in the nationally televised Franklin American Mortgage Music City Bowl. In 2013, Mr. Marshall finished second on the team with 80 total tackles and averaged 7.1 tackles in SEC competition. He played a pivotal role in the defeat of the nationally ranked Georgia team and, in another game, contributed three tackles against Houston in the nationally televised BBVA Compass Bowl. Pursuant to NCAA and SEC rules, Mr. Marshall never received any compensation from Broadcast Defendants or Licensing Defendants for the commercial exploitation of his name, image, and likeness.

12.     Plaintiff Eric Samuels currently lives in Eustis, Florida. Mr. Samuels played on the Vanderbilt University football team in the 2009, 2010, 2011, and 2012 seasons. Mr. Samuels saw significant action on the football field as a freshman at the defensive back position. In 2010, Mr. Samuels' sophomore season, he played in all 12 games, recording 27 total tackles. Mr. Samuels also saw action as a return specialist, averaging 20.3 yards per kickoff return. In 2011, Mr. Samuels appeared in all 13 games and helped lead his team to the nationally televised AutoZone Liberty Bowl. He was the team's leading tackler against Arkansas and tallied four tackles against Wake Forest. By his senior season, Mr. Samuels was one of the best defensive

backs in the SEC. He concluded the season with 35 tackles, including a career high 5 solo tackles against Kentucky. Mr. Samuels played in the nationally televised Franklin American Mortgage Music City Bowl against North Carolina State, posting three solo tackles and an interception. Pursuant to NCAA and SEC rules, Mr. Samuels never received any compensation from Broadcast Defendants or Licensing Defendants for the commercial exploitation of his name, image and likeness.

13.     Plaintiff Sean Parker currently lives in Los Angeles, California. Mr. Parker played on the University of Washington football team in the 2010, 2011, 2012, and 2013 seasons. Mr. Parker played at the defensive back position and started in all 13 games as a sophomore, earning an All-Pac-12 honorable mention safety as a junior. His career highlights include four tackles in a start against LSU in 2012; six tackles and a forced fumble against Arizona in 2012; and three tackles, an interception and three pass break-ups in a victory over Number 7 ranked Oregon State in 2012. All of these games were high-profile matchups and nationally televised. Pursuant to NCAA and Pac-12 rules, Mr. Parker never received any compensation from Broadcast Defendants or Licensing Defendants for their commercial exploitation of his name, image and likeness.

14.     Plaintiff Patrick Miller currently lives in Chicago, Illinois. Mr. Miller played guard on the Tennessee State University men's basketball team from 2010 to 2013. He holds school records in both assists (195) and minutes played (1186). He was voted the Freshman Ohio Valley Conference Player of the Year in 2011 and starred in the nationally televised Ohio Valley Conference Tournament in 2011, 2012, and 2013, making the Ohio Valley Conference All-Tournament Team in 2012 as a sophomore. As a junior, Mr. Miller led the Ohio Valley Conference in assists per game (5.8), earning him a spot on the 2012-2013 All-Ohio Valley

Conference First Team. Pursuant to NCAA and OVC rules, Mr. Miller never received any compensation from Broadcast Defendants or Licensing Defendants for their commercial exploitation of his name, image, and likeness.

15. Plaintiff Steven Clarke currently lives in Nashville, Tennessee. Mr. Clarke played on the Vanderbilt University football team in the 2010, 2011, 2012, and 2013 seasons. He saw significant playing time as a defensive back in each of his four seasons at Vanderbilt. Mr. Clark started every game at cornerback in 2013, tallying 42 tackles, a fumble recovery, and an interception. In a nationally televised game against South Carolina, he completed a 69 yard interception return. This fumble recovery also occurred before a national television audience and contributed to a Vanderbilt victory over Florida. Pursuant to NCAA and SEC rules, Mr. Clarke never received any compensation from Broadcast Defendants or Licensing Defendants for their commercial exploitation of his name, image, and likeness.

16. Plaintiff Rod Wilks currently lives in Knoxville, Tennessee. Mr. Wilks competed on the University of Tennessee football team in the 2009, 2010, 2011, and 2012 seasons. While playing at Tennessee, Mr. Wilks recorded 43 tackles over his four-year career. In 2011, he led Tennessee in special teams tackles (8), and registered a forced fumble and fumble recovery. That same year, he garnered 4 tackles against fellow SEC opponent South Carolina and played most of the game against number 2 ranked Alabama. Both of these games were nationally televised and produced millions of dollars in revenue for the SEC and national television networks. Pursuant to NCAA and SEC rules, Mr. Wilks never received any compensation from Broadcast Defendants or Licensing Defendants for their commercial exploitation of his name, image, and likeness.

17.     Plaintiff Byron Moore currently lives in Knoxville, Tennessee.  Mr. Moore played for the University of Tennessee football team in the 2011, 2012 and 2013 seasons.  In 2011, Mr. Moore competed in all but one game for Tennessee, playing a vital role nationally televised games against Alabama and South Carolina.  In 2012, Mr. Moore played in all 12 games for Tennessee and tied for second on the team with 6 special team tackles.  In 2013, Mr. Moore was selected preseason Third Team All-SEC.  In a nationally televised game against number 7 ranked Auburn, Mr. Moore tallied an impressive four tackles.  Pursuant to NCAA and SEC rules, Mr. Moore never received any compensation from Broadcast Defendants or Licensing Defendants for their commercial exploitation of his name, image, and likeness.

18.     Plaintiff Chaz Moore currently lives in Chattanooga, Tennessee.  Mr. Moore competed on the University of Tennessee at Chattanooga football team in the 2010, 2011, 2012 and 2013 seasons.  Mr. Moore started in all games as junior and senior and was voted Second Team All-Southern Conference as a senior in 2013.  In 2013, Mr. Moore ranked tenth in the nation in kick-off return average (29.1 yards) and posted 70 tackles for the year, including ten in a nationally televised game against Alabama.  Pursuant to NCAA rules, Mr. Moore never received any compensation from Broadcast Defendants or Licensing Defendants for their commercial exploitation of his name, image, and likeness.

19.     Plaintiff Marlon L. Walls currently lives in Memphis, Tennessee.  Mr. Walls played on the University of Tennessee football team in the 2009, 2011, 2012, and 2013 seasons.  Over the course of his collegiate career, Mr. Walls played in 40 games, recording 57 tackles and 5.5 sacks.  In 2009, Mr. Walls, as a freshman defensive tackle, played in seven games, including the nationally televised Chick-fil-A Bowl.  In his junior and senior years, Mr. Walls played in nearly every game.  In 2013, Mr. Walls finished second highest on the team with 4.5 sacks.  Many of

these games were primetime, nationally televised SEC matchups that produced millions of dollars in revenue for the SEC and several television networks. Pursuant to NCAA and SEC rules, Mr. Walls never received any compensation from Broadcast Defendants and Licensing Defendants for their commercial exploitation of his name, image, and likeness.

20.     Chris Conner currently lives in Nashville, Tennessee. Mr. Conner competed on the University of Maryland Eastern Shore basketball team in the 2008-2009 season. While at the University of Maryland Eastern Shore, Mr. Conner started in 8 games and averaged 25.6 minutes of playing time per game. Pursuant to OVC and NCAA rules, Mr. Conner never received any compensation from Broadcast Defendants or Licensing Defendants for their commercial exploitation of his name, image, and likeness.

## BROADCAST DEFENDANTS

### Defendant ESPN

21.     ESPN, incorporated in Delaware, is an "Entertainment Sports Network" allegedly worth approximately $50 billion.

22.     Headquartered in Bristol, Connecticut, ESPN regularly airs FBS football and NCAA Division I men's basketball games, earning billions of dollars in profits from the use of Plaintiffs' and Class Members' images.

23.     As the self-proclaimed "Worldwide Leader in Sports," ESPN recently reached a deal to broadcast the new college football playoff and each of its six associated games from 2014 through 2025. Upon information and belief, it is alleged that the total price of the deal is worth over $5 billion.

24.     ESPN's coverage of FBS football and NCAA Division I basketball games airs on the following ESPN networks: ESPN; ESPN2; ESPN Classic; and ESPN U, a network dedicated to college sports.

25.     ESPN Regional Television (formerly branded as ESPN Plus) is the network's syndication arm, which produces collegiate sporting events for broadcast television stations throughout the United States.  ESPN Regional Television syndicates college football and basketball games from the American Athletic Conference, Big 12 Conference, Mid-American Conference, Metro Atlantic Athletic Conference, Sun Belt Conference, and the Western Athletic Conference.

26.     ESPN's coverage of college sports also extends to WatchESPN, a website for desktop computers as well as an application for smartphones and tablet computers that allows subscribers of participating cable and satellite providers to watch live streams of programming from ESPN and its sister networks.

27.     ESPN's own agents have publicly admitted that Student Athletes should be compensated.

**Defendant CBS**

28.     CBS, a Delaware corporation, is a multi-billion dollar television network that has provided national coverage of FBS football and Division I men's basketball for decades.

29.      Headquartered in New York, New York, CBS exclusively airs the annual NCAA Division I Men's Basketball Tournament.  CBS earns billions of dollars in profit from this alone. Upon information and belief, it is alleged that CBS also airs weekly SEC college football games that generate millions of dollars in revenue for CBS.

**Defendant NBC**

30.     NBC, a Delaware corporation, is a multi-billion dollar television network headquartered in New York, New York.

31.     Since 1991, NBC has enjoyed exclusive national coverage of all University of Notre Dame home football games.

**Defendant ABC**

32.     ABC, a Delaware corporation, is a multi-billion dollar television network that airs multiple "prime-time" FBS football games that generate millions of dollars in annual revenue for ABC.

33.     ABC and ESPN use the underlying college football and basketball games to promote and advertise each other's programming, including even programming that is non-sports related (such as prime-time television shows).

**Defendant FOX**

34.     FOX, a Delaware corporation, is a multi-billion dollar television network that airs exclusive coverage of the Big Ten Football Championship and the AT&T Cotton Bowl.

35.      In addition to its coverage of FBS football, Fox and Fox Sports, a division of Fox, broadcasts Division I men's basketball games and recently signed a multi-year contract allegedly worth approximately $600 million with the Big East Conference to broadcast Big East Conference men's basketball games.

<b>CONFERENCE DEFENDANTS</b>

36.     Defendant Atlantic Coast Conference ("ACC") is an unincorporated entity that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business located in Greensboro, North Carolina.

37.     Defendant Big Ten Conference ("Big Ten") is a corporation organized under the laws of Delaware that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3)

of the U.S. Internal Revenue Code, with its principal place of business located in Rosemont, Illinois.

38.     Defendant Big 12 Conference, Inc. ("Big 12") is a corporation organized under the laws of Delaware that identified itself, as of 2011, as a tax-exempt organization under section 501(c)(3) of the U.S. Internal Revenue Code with its principal place of business located in, Irving, Texas.

39.     Defendant Pacific-12 Conference ("Pac-12) is an unincorporated entity that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business located in Walnut Creek, California.

40.     Defendant Southeastern Conference ("SEC") is an unincorporated entity that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code with its principal place of business located in Birmingham, Alabama.

41.     Defendant Conference USA ("Conference USA") is an unincorporated entity that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code with its principal place of business located in Irving, Texas.

42.     Defendant Big East Conference (the "Big East") is an unincorporated entity that identifies itself as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code with its principal place of business in New York, New York.

43.     Defendant Ohio Valley Conference (the "OVC") is an unincorporated entity that identifies itself as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code with its principal place of business located in Brentwood, Tennessee.

## LICENSING DEFENDANTS

**Defendant IMG Worldwide**

44.     IMG Worldwide operates its sports, fashion, and media business in the United States and internationally, including Tennessee.

45.     IMG Worldwide provides consulting, event management, hospitality, league development, licensing, media distribution, and media production.

46.      IMG Worldwide focuses on the marketing and licensing of collegiate media rights, as well as the production and distribution of college sports programming.   In addition, IMG Worldwide develops sports performance research, products, and services; operates an academic and athletic training institution; and connects brands with consumers through access to sports and entertainment properties.

47.     IMG Worldwide was formerly known as International Management Group.   The company was founded in 1960 and is headquartered in New York, New York.

**Defendant IMG College**

48.     IMG College is a Delaware corporation registered to do business and doing business in Tennessee through the Tennessee Secretary of State.

49.      IMG College is the nation's leading collegiate sports marketing company, offering national, regional, and local multi-platform marketing opportunities targeting 190 million college sports fans – the largest and most attractive sports fan base.

50.     IMG College is blazing new trails in the growing collegiate market with exclusive media rights to nearly 90 universities and conferences, including two-thirds of Bowl Championship Series ("BCS") member schools.

51.     IMG College, through its licensing affiliate, The Collegiate Licensing Company (CLC), also represents the exclusive trademark licensing and consumer product rights for more than 200 top schools, conferences and bowl games.

52.     IMG College manages nearly 5,000 hours of local television programming, is the leading publisher of college sports publications, and is the largest manager of university athletic websites.

53.     Headquartered in Winston-Salem, N.C., IMG College employs more than 700 people in nearly 100 offices throughout the U.S.  IMG College is a division of IMG Worldwide.

**Defendant Big Ten Network**

54.     Big Ten Network purports to be the first internationally distributed television network dedicated to covering the Big Ten.

55.     With nearly 1,000 sports events across all platforms in high definition, Big Ten Network is the ultimate destination for Big Ten fans and alumni across the country.

56.     The network is on the air 24 hours a day, 365 days a year.  The network reaches more than 52 million homes, through agreements with more than 300 cable and satellite affiliates in all fifty states and Canada.   Upon information and belief, it is alleged that Big Ten Network is a Delaware registered LLC and headquartered in Chicago, Illinois.

**Defendant CBS Collegiate Sports Properties**

57.     CBS Collegiate Sports Properties, a Delaware corporation, holds itself out as the most innovative collegiate and facility sports marketing company in the country.

58.     CBS Collegiate Sports Properties is doing business in Tennessee and headquartered in Spokane Valley, Washington.

**Defendant JMI Sports**

59.     JMI Sports, a Delaware registered company, describes itself as a leading provider of sales, marketing and project management services to universities, professional teams and municipalities and having expertise in multimedia rights.

60.     JMI Sports is headquartered in San Diego, California but also has offices in San Rafael, California and Greenville, South Carolina.

61.     Although it is doing business in Tennessee, JMI Sports is not registered with the Tennessee Secretary of State.

**Defendant TeleSouth**

62.     TeleSouth is a multimedia company doing business in Tennessee.  TeleSouth operates several networks and numerous radio stations in Mississippi witch reach into Tennessee.

63.     TeleSouth is a Mississippi corporation headquartered in Jackson, MS.  Prior to selling its interest in Ole Miss sports' multimedia rights to IMG College, TeleSouth was the exclusive producer and distributor of Ole Miss sports programming. TeleSouth coordinated and distributed football, men's and women's basketball, and baseball radio broadcasts.

**Defendant T3 Media**

64.     T3 Media is a third-party licensing company doing business in Tennessee.

65.     T3 Media is registered in Delaware and headquartered in Denver, Colorado.

66.     T3 Media acts as the NCAA's agent in licensing archival footage for game re-broadcasts, advertisements, and any other products.

**Defendant SEC Network**

67.     The SEC Network recently launched on August 14, 2014 after ESPN and the SEC signed a 20-year agreement through 2034.

68.     The SEC Network currently airs SEC content 24/7, which will include more than 1,000 events in its first year. The SEC Network will televise 45 SEC football games and more than 100 men's basketball games annually. Many of these games will take place in Tennessee. Southeastern Conference d/b/a SEC Network.

**Defendant Longhorn Network**

69.     Longhorn Network is a 24-hour television network dedicated to the University of Texas Longhorns' sports.

70.     The Longhorn Network is owned as a joint venture between the University of Texas at Austin, ESPN, and IMG College.

71.      Headquartered in Austin, Texas, the Longhorn Network broadcasts Texas Longhorn football and basketball games nationally via cable and satellite.

72.     The Longhorn Network operates under a 20-year contract, signed in 2011, with the University of Texas at Austin which obligates the Longhorn Network to broadcast at least one live football game and eight men's basketball game per year.  Upon information and belief, it is alleged that, under the terms of the contract, ESPN pays the University of Texas approximately $11 million per year, with an annual increase of three percent, and that the deal is worth approximately $300 million over the 20 year period.

**Defendant Learfield Sports, LLC ("Learfield Sports")**

73.     Learfield Sports is a Missouri corporate entity doing business in Tennessee and headquartered in Jefferson City, Missouri.

74.     In 2014, Learfield acquired Nelligan Sports Marketing, adding 41 collegiate properties to its multimedia portfolio that had already included 56 college athletic programs.  Learfield's exclusive sports programming reaches more than 56 million television households nationally.

{01140122.1 }

**Defendant William Morris**

75.     William Morris, a talent and multimedia company, acquired IMG Worldwide in 2013 for approximately $2.3 billion dollars.

## NCAA

76.     The National Collegiate Athletic Association (the "NCAA") is an unincorporated association consisting of more than 1,200 colleges, universities, and athletic conferences situated throughout the United States.  The NCAA serves as the governing body of its member schools and athletic conferences and engages in interstate commerce in the business of negotiating lucrative media contracts with the Broadcast and Licensing Defendants of FBS football and Division I Men's basketball games in the United States.  The NCAA maintains its headquarters and principal place of business in Indianapolis, Indiana.

## JURISDICTION AND VENUE

77.     This Court has subject matter jurisdiction over all federal claims pursuant to 28 U.S.C. §§ 1331 (federal question), 1337 (commerce and antitrust regulation), and 1338 (unfair competition regulation) as part of this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 43 of the Lanham Act (15 U.S.C. § 1125(a)).

78.     This Court has supplemental subject matter jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

79.     This Court also has subject matter jurisdiction over all state law claims in this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5 million, exclusive of interest and costs, and some members of the proposed class are citizens of a state different from Defendants.

80.     This Court has personal jurisdiction over the Defendants because Defendants' conduct substantial business in this District.  In addition, many of the violations giving rise to this Complaint took place in this District, including the actual setting for many of the underlying games featured in the broadcasts of FBS football and Division I men's basketball games, as well as the airing of all games.

81.     This Court has both general and specific personal jurisdiction over Defendants, since Defendants continuously and systematically conduct business in the State of Tennessee, where they have purposefully availed themselves of the privilege of acting in this State, thus invoking the benefits and protections of its laws.

82.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on their own behalf and on behalf of the following:

> All current and former Student Athletes residing in the United States who are or have been members of an FBS (which, before 2006, was known as Division I-A) men's football team or an NCAA Division I college or university men's basketball team and whose images have been used, licensed or sold by Defendants, their co-conspirators, or their licensees.
>
> The class excludes the officers, directors, and employees of any FBS or NCAA Division I college or university, and the officers, directors, or employees of any FBS or NCAA Division I athletic conference.

84.     The proposed members of the class are collectively referred to herein as the "Class," "Classes," "Class Members" or "Student Athletes," unless otherwise individually specified.

85.     Plaintiffs seek nationwide certifications for the federal antitrust and federal false endorsement claims.

86.    Plaintiffs seek nationwide certifications for the state law claims of civil conspiracy, violations of Tennessee's statutory and common law right of publicity, and unjust enrichment.

87.    Plaintiffs do not know the exact number of Class Members, but Plaintiffs believe that, due to the magnitude of the trade and commerce involved, Class Members number in the thousands and are geographically diverse so that joinder of all Class Members is impracticable.

88.    There are questions of law and fact common to Class Members, including but not limited to the following:

   a.    Whether Defendants and their co-conspirators engaged in or entered into a contract, combination, or conspiracy among themselves to fix, depress, maintain, and/or stabilize prices paid to Class Members for the use of their images;

   b.    Whether Defendants' unlawful conduct has resulted in a market with below competitive levels of compensation that Class Members receive for the use of their images as compared to a market free of anticompetitive restraints;

   c.    The duration of the conspiracy alleged herein;

   d.    Whether Defendants violated Section 1 of the Sherman Act;

   e.    Whether Defendants violated Section 43 of the Lanham Act;

   f.    Whether Form 08-3a is unenforceable;

   g.    Whether Defendants have misappropriated Class Members' images;

   h.    Whether Defendants have been unjustly enriched.

89.    The filing of separate lawsuits by individual Class Members would create the risk of inconsistent adjudications with respect to individual Class Members, which would create incongruent standards for the Defendants.

90.    Every Class Member is, has been, and/or will be subject to uniform agreements, rules, and practices among the Defendants that restrain competition for player services, including, but not limited to, the NCAA Bylaws and conference rules set forth herein; agreements and contracts

between and among Broadcast Defendants, Licensing Defendants, Conference Defendants, and the NCAA; and any and all similar player restraints that are or will be uniformly imposed by the Defendants on Class Members.

## FACTUAL ALLEGATIONS

**Background of the Anticompetitive Restraints**

91.     Intercollegiate athletics originated as extracurricular activities that were initially student controlled, funded and managed.  As these activities grew in popularity, the administrators of schools began to exhibit control to address the following issues: professionalism, academic integrity, recruiting and eligibility, and physical safety of students competing in football.

92.     The violent nature of intercollegiate football during the early 1900s gave rise to greater institutional control and, ultimately, a governing body that could formulate rules to ensure the safety of all participants.

93.     President Theodore Roosevelt, concerned with player safety, reformed the landscape of intercollegiate football with the founding of the Intercollegiate Athletic Association of the United States ("IAAUS") in 1905, which was officially established on March 31, 1906.  In 1910, the IAAUS changed its name to the NCAA.

94.     Since its inception, the NCAA has gradually evolved into an environment that exploits its member athletes, all in the name of amateurism.

95.     According to the NCAA Manual, "amateurism" is defined in the following manner:

> Student-athletes shall be amateurs in intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from commercial exploitation by professional and commercial enterprises.

{01140122.1 }

96.     Despite this articulated goal of protecting Student Athletes from commercial exploitation, the NCAA and Defendants have conspired to create the present day landscape of college athletics, resembling a plantation type arrangement where the NCAA and Defendants are economically dependent on the commercial exploitation of Student Athletes.

**The Anticompetitive Agreements Between the NCAA and Conference Defendants**

97.     The current NCAA Constitution states that the fundamental purpose of the NCAA is to:

> maintain intercollegiate athletics as an integral part of the education program and the athlete as an integral part of the education program as and part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

98.     The NCAA and Conference Defendants jointly enforce this clear demarcation between Student Athletes and professional athletes by permitting only "amateur" Student Athletes to participate in intercollegiate sports. Once a Student Athlete loses his amateur status, the Student Athlete is no longer eligible to participate in collegiate athletics.

99.     Article 12 of the NCAA manual lists the following ways in which a Student Athlete loses his or her amateur status:

    a.  Uses his or her athletics skill (directly or indirectly) for pay in any form in that sport;

    b.  Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;

    c.  Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received;

    d.  Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;

    e.  Competes on any professional athletics team per Bylaw 12.02.4, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;

f. After initial full-time collegiate enrollment, enters into a professional draft; or

g. Enters into an agreement with an agent;

100. These rules are inherently anticompetitive because they forbid Student Athletes from competing in the marketplace for the value of their services on and off the playing field. Left with no reasonable alternative to pursue their athletic careers, Student Athletes are forced to comply with these provisions or face the penalty of being declared ineligible.

101. These rules constitute horizontal agreements between the NCAA and Conference Defendants because they are proposed, drafted, voted upon, and agreed upon by NCAA members, including all of the Conference Defendants.

102. The Conference Defendants, as NCAA members, have agreed to enforce the above cited rules and have established their own set of anticompetitive rules.

103. Conference Rules restraining Student Athletes from the market of licensing their image include, among others, the following:

   a. ACC Constitution Article II ("General Purpose"): "The Conference aims to . . . (e) Coordinate and foster compliance with Conference and NCAA rules."

   b. ACC Bylaw Article II: "Member institutions are bound by NCAA rules and regulations, unless Conference rules are more restrictive."

   c. Big Ten Bylaw 14.01.3 ("Compliance with NCAA and Conference Legislation"): "The Constitution and Bylaws of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified by the Conference Rules and Agreements."

   d. Big 12 Bylaw 1.3.2 ("Adherence to NCAA Rules"): "All Members of the Conferences are committed to complying with NCAA rules and policies . . . In Addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference . . . ."

   e. Big 12 Bylaw 6.1 ("Eligibility Rules"): "A student-athlete must comply with appropriate minimum requirements of the NCAA and the Conference in order to be eligible for athletically-related aid . . . ."

f.  Big 12 Bylaw 6.5.3 ("Financial Aid Reports"): "Each institution shall comply with all financial aid legislation of the NCAA and the conference . . . ."

g.  Pac-12 Bylaw 4.2 ("Application of NCAA Legislation"): "The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding."

h.  Pac-12 Regulation 3-1: "The rule of the [NCAA] shall govern all matters concerning financial aid to student-athletes except to the extent that such rules modified by the CEO Group."

i.  SEC Bylaw Article 5.01.1 ("Governance"): "The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA."

j.  SEC Bylaw Article 15.01 ("General Principles"): "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and SEC regulations."

104.    These anticompetitive rules are strictly enforced, leaving member institutions and Student Athletes no choice but to submit to them or face severe penalties, including, a boycott by the member institutions against players who do not comply, suspension from play, and the potential loss of a Student Athlete's amateur status.

**Unlawful and Anticompetitive Agreements between Broadcast Defendants and the NCAA and Conference Defendants**

105.    The Broadcast Defendants have all entered into lucrative, anticompetitive contracts with the NCAA and Conference Defendants for "first-tier" and "second-tier" broadcasting rights.

106.    First-tier rights are for football and/or basketball games broadcast nationally.

107.    Second-tier rights are for football and/or basketball games not selected by the first-tier rights holders.

108.    Deals between Conference Defendants and Broadcast Defendants encompass multiple tiers.  For example, Defendant Pac-12 has an agreement with Defendant ESPN and Defendant FOX that covers first and second-tier rights.

{01140122.1 }

109.    The agreements between the Broadcast Defendants, the Licensing Defendants, the Conference Defendants, and the NCAA exclude Student Athletes from participating in the marketplace for the licensing, sale, and use of Student Athletes' names, images, and likenesses.

110.    Instead of negotiating and entering into licensing agreements with the Student Athletes, Broadcast Defendants and Licensing Defendants only negotiate and enter into agreements with the NCAA, Conference Defendants, and their member institutions.

111.    The Student Athletes are  leaving the economic driving force behind the lucrative business of college sports, the Student Athletes, unrepresented and uncompensated for their services.

112.    These agreements effactually adopt and implement the above quoted restrictive NCAA and Conference Defendant bylaws and rules, resulting in an anticompetitive marketplace in which all of the Defendants unlawfully profit off of Class Members' names, images, and likenesses.

113.     Upon information and belief, it is alleged that these agreements are collectively worth tens of billions of dollars, and that such agreements do not contain any enforceable provision by which the Broadcast Defendants attain the right to commercially exploit the value of Class Members' names, images, and likenesses.  Examples of such agreements include, but are not limited to, the following:

        a.      In 1979, the first two-year agreement with ESPN was signed to televise selected championships.

        b.      In 1989, the NCAA and CBS signed a television agreement valued at approximately $1 billion for 1991 through 1997.

        c.      In 1994, the NCAA and CBS agreed to an eight-year television contract valued at approximately $1.725 billion.

d.      In 1999, the NCAA and CBS agreed to an eleven-year contract for the media rights to Division I Men's Basketball Championship valued at approximately $6 billion.

e.      The Big 12 signed a contract with ESPN for first-tier broadcasting rights through 2015-16 valued at approximately $480 million.

f.      The Big 12 signed a contract for second-tier broadcasting rights through 2024-25 valued at approximately $1.17 billion.

g.      The PAC-12 signed a contract with ESPN/FOX for first-tier broadcasting rights through 2023-24 valued at approximately $3 billion.

h.      The SEC signed a contract with CBS for first-tier broadcasting rights through 2023-24 valued at approximately $825 million.

i.      The SEC signed a contract with ESPN for second-tier broadcasting rights through 2023-24 valued at approximately $2.25 billion.

j.      The Big Ten signed a contract with ESPN for first-tier broadcasting rights through 2016-17 valued at approximately $1 billion.

k.      The Big Ten signed a contract with the Big Ten Network for second-tier broadcasting rights through 2031-32 valued at approximately $2.8 billion.

l.      The ACC signed a contract with ESPN for first-tier broadcasting rights through 2026-27 valued at approximately $3.6 billion.

m.      The Big East signed a $500 million contract with Fox for first-tier broadcasting rights for twelve years valued at approximately $500 million.

n.      CBS is currently in a contract worth over approximately $6 billion dollars for the exclusive media rights to broadcast the NCAA Basketball Tournament and the Final Four.

114.    In spite of the NCAA and Defendants' multi-billion dollar agreements, the Student Athlete, receives nothing or, at most, the cost of attendance.

115.    NCAA and conference rules even go as far to place quotas on the number of meals a Student Athlete may eat. These restrictive rules have deprived Student Athletes from realizing the commercial value of their images. For example, a basketball scholarship at the University of Kentucky is worth approximately $12,000 per year, yet the basketball team consisting of no

more than 13 scholarship players, generated approximately $23 million dollars in revenue in 2012.

116.    Under NCAA rules, college athletes can be left to pay sports-related medical bills, can have their scholarships revoked for any reason, are left to pay thousands of dollars in out-of-pocket educational related expenses while on "full scholarship."

117.    Approximately 50% of NCAA football and men's basketball players are left without a college degree.

118.    The room and board provisions in full scholarship leave 85% of players living on campus and 86% of players living off campus living below the federal poverty line.

119.    According to at least one study, the fair market value of the average Student Athlete over a four-year period, is approximately worth $456,000 and $1,060,000 "above and beyond" the value of their scholarships, respectively.

**Licensing Defendants' Anticompetitive Behavior**

120.    Licensing Defendants have entered into and remain in anticompetitive multimedia licensing agreements with NCAA member schools.

121.    Hundreds of collegiate institutions throughout the United States entrust Licensing Defendants to assist in the management of their intellectual property licensing programs.

122.    Licensing Defendants offer their collegiate partners services in brand management and brand development.  As such, Licensing Defendants act as a conduit in licensing college teams' intellectual property, including the licensing of Student Athlete publicity rights.

123.    The agreements between the Licensing Defendants and NCAA member institutions purportedly encompass the commercial value of Student Athletes' rights of publicity, yet

Licensing Defendants refuse to negotiate or enter into agreements with Student Athletes to obtain such rights.

**<u>Relevant Market</u>**

124.    The market for broadcasting FBS football and NCAA Division I basketball games is worth billions of dollars and geographically extends throughout the entire United States.

125.    The market for broadcasting FBS football and NCAA Division I basketball games includes, but is not limited to, venue access; rights to use and reference team logos and trademarks; and rights to use Student Athletes' names, images, and likenesses.

126.    According to a Drexel University Sport Management Department Study (hereinafter "the Study"), published by Defendant CBS, collegiate football and men's basketball players at top sports schools are being denied at least $6.2 billion between 2011 and 2015.

127.    According to the Study, the average FBS football student athlete has a fair market value of $456,612 "above and beyond" the value of their scholarship.

128.    According to the Study, the average men's basketball player has a fair market value of $1.06 million over four years, not including his scholarship.

129.    The NCAA, by its own manual, purports to protect Student Athletes from commercial exploitation, yet has conspired with Defendants to create an anticompetitive market where Student Athletes are powerless to realize the commercial value of their names, images and likenesses.

130.    In the absence of Defendants' conspiracy, Student Athletes would become natural participants in the marketplace for use and broadcast of their names, likenesses and/or images.

131.     The absence of Defendants' anti-competitive actions would create a marketplace where Student Athletes could compete as market participants and sell licenses for their names, images, and likenesses to Defendants.

**The Unauthorized Use of Student Athletes' Names, Images, and Likenesses**

132.     The NCAA prohibits a Student Athlete from participating in an NCAA sanctioned event unless the Student Athlete annually signs a form, known as "Form 08-3a," that purports to allow the NCAA to use the Student Athlete's name or picture to "generally promote" NCAA championships or other NCAA events, activities or programs.

133.     By its own terms, Form 08-3a, merely purports to authorize the NCAA, or a third party acting on behalf of the NCAA, to use a Student Athlete's name or picture to "generally promote" NCAA championships or other NCAA events, activities, or programs.

134.     The meaning of "generally promote" is not defined, rendering Student Athletes uninformed as to what they are signing.

135.     Form 08-3a, therefore, does not grant the NCAA, or any third party acting on behalf of the NCAA, the power or authority to sell or license Student Athletes' names, images, or likenesses.

136.     Student Athletes desiring to extend their athletic careers beyond high school are left with no comparable alternative to accepting a scholarship from an FBS football or Division I basketball school.

137.     Both the National Football League ("NFL") and the National Basketball Association ("NBA") prohibit high school players from entering their leagues directly after high school. To be eligible for the NFL draft, a player must be at least 3 years removed from high school. To be eligible for the NBA draft, a player must be at least 1 year removed from high school.

{01140122.1 }

28

138.     FBS football and Division I basketball schools are, therefore, the only reasonable options for Student Athletes desiring to extend their athletic careers beyond high school, which is why Student Athletes, who are offered scholarships at these schools, rarely pursue other options.

139.     With no reasonable alternative, Student Athletes retain zero bargaining power and are coerced to sign Form 08-3a in order to be declared eligible to play in NCAA games.   Therefore, Form 08-3a constitutes a contract of adhesion and is unenforceable.

140.     In addition, many Student Athletes, regardless of their age, whether they are either minors or barely 18 years old, are required to sign Form 08-3a, without any knowledge of its true meaning.

141.     Therefore, any contract between the NCAA, its member institutions, and third parties purporting to grant such rights is void.

142.     With no rights to Student Athletes' names, images, or likenesses, Defendants' commercial exploitation of such names, images, and likenesses is unauthorized and, therefore, constitutes a violation of Student Athletes' rights of publicity.

143.     The unconscionable effect of form 08-3a is further codified in Rule 12.4.4 of the NCAA manual.  Under Rule 12.4.4, Student Athletes may start their own business, but are prohibited from using their own name, photograph, image, appearance, or athletic reputation in promoting the business.

144.     Under NCAA Rule 12.4.4 Student Athletes, unlike all other students, are forced to sell themselves short in the market for their very own image, while Broadcast Defendants, Conference Defendants, and Licensing Defendants profit astronomically in the amount of billions of dollars.  Therefore, Form 08-3a serves as a fundamental mechanism in propogating the current anticompetitive nature of college sports.

145.    Because Form 08-3a is void, unconscionable, ambiguous, or otherwise invalid, all Defendants have misappropriated Class Members' names, images, and likenesses.

146.    Broadcast Defendants' misappropriation of Class Members' images, names or likenesses extends to nationwide broadcasting and advertising of games in which many Class Members have played.

147.    Licensing Defendants' misappropriation of Class Members' images, names or likenesses extends to nationwide broadcasting and group licensing members' rights to various television networks.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violations of Rights of Publicity)
### Against All Defendants, Tenn. Code Ann. § 47-25-1105

148.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

149.    Tennessee Code Annotated § 47-25-1105 states that:

> Any person who knowingly uses or infringes upon the use of another individual's name, photograph, or likeness in any medium, in any manner directed to any person other than such individual, as an item of commerce for purposes of advertising products, merchandise, goods, or services, or for purposes of fund raising, solicitation of donations, purchases of products, merchandise, goods, or services, without such individual's prior consent, or, in the case of a minor, the prior consent of such minor's parent or legal guardian, or in the case of a deceased individual, the consent of the executor or administrator, heirs, or devisees of such deceased individual, shall be liable to a civil action.

150.    Plaintiffs' and Class Members' names, images, and likenesses have substantial commercial value.

151. Pursuant to and in furtherance of their unlawful conspiracy with the NCAA, Defendants have used and continue to use Plaintiffs' and Class Members' names, images, and likenesses without Class Members' consent for the purposes of advertising the airings of NCAA FBS football and Division I basketball games.

152. Defendants have willfully and intentionally used, and continue to use and commercially exploit, Plaintiffs' and Class Members' rights of publicity.

153. Defendants have violated each and every Class Members' right of publicity within the State of Tennessee by airing Plaintiffs' and Class Members' names, images, and likeness throughout Tennessee without Plaintiffs' or Class Members' consent. In addition, many of the underlying games, the subject of such airings, took place in Tennessee.

154. The unauthorized use of Plaintiffs' and Class Members' names, images, and likenesses for commercial purposes constitutes an infringement on their rights of publicity that is distinct from any other legally protected right. The right of publicity protects the underlying individual's image, which is not fixed in tangible form, from being commercially exploited without the individual's consent.

155. As a direct and proximate result of Defendants' violation of Plaintiffs' and Class Members' publicity rights, Plaintiffs and Class Members have been injured.

### SECOND CAUSE OF ACTION
### (Violation of Tennessee Common Law Right of Publicity)
### Against all Defendants

156. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

157. Plaintiffs' and Class Members' names, images, and likenesses have substantial commercial value.

{01140122.1 }

158.    Tennessee's common law right of publicity is broader than its statutory counterpart quoted above.  The common law claims extend to hold persons liable for right of publicity violations in which a person's name, image or likeness is used for any and all commercial purposes without the person's consent.

159.    Pursuant to and in furtherance of their unlawful conspiracy with the NCAA, Defendants have used and continue to use Plaintiffs' and Class Members' names, images, and likenesses without Class Members' consent for the purpose airing, advertising, and licensing broadcasting rights for NCAA FBS football and Division I basketball games.

160.    Defendants have willfully and intentionally used, and continue to use and commercially exploit, Plaintiffs' and Class Members' rights of publicity.

161.    Defendants have violated each and every Class Members' right of publicity within the State of Tennessee by airing Plaintiffs' and Class Members' names, images, and likeness throughout Tennessee, without Plaintiffs' or Class Members' consent.  In addition, many of the underlying games, the subject of such airings, took place in Tennessee.

162.    The unauthorized use of Plaintiffs' and Class Members' names, images, and likenesses, for commercial purposes, constitutes an infringement on their rights of publicity that is distinct from any other legally protected right because the right of publicity protects the underlying individual's image, which is not fixed in tangible form, from being commercially exploited without the individual's consent.

163.    In furtherance of their unlawful conspiracy with the NCAA, Defendants have utilized and continue to utilize the names, images and likeness of Plaintiffs and Class Members in Broadcast and Licensing Defendants' airings without Plaintiffs' or Class Members' consent for Defendants' own commercial advantage.

{01140122.1 }

164.     As a result of Defendants' misappropriation of Plaintiffs' and Class Members' publicity rights, Plaintiffs and Class Members have been injured.

### THIRD CAUSE OF ACTION
#### (Civil Conspiracy)
**Against all Defendants**

165.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

166.     Under Tennessee law, the elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury.

167.     Each Defendant has conspired and combined with each other to use Class Members' likenesses without permission and achieved mutual assent, through either express or tacit agreement, on an object or course of action of the conspiracy, including depriving Plaintiffs and Class Members of their right to commercially benefit from their rights of publicity and their contractual property rights.

168.     Defendants have created and functioned as a civil conspiracy with each other and the NCAA, collectively performing as part of the conspiracy through numerous overt acts in furtherance of the common design, including one or more unlawful acts that are performed to achieve a lawful or unlawful goal, or one or more lawful acts that were performed to achieve an unlawful goal.

169.     As a result of Defendants' concerted misconduct, Plaintiffs and Class Members have been injured.

## FOURTH CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Antitrust Act)
### Against all Defendants

170.  Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

171.  Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

172.  Defendants and the NCAA entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

173.  The contract, combination, or conspiracy alleged herein has resulted in concerted action among the Defendants and the NCAA whereby as a result of these actions the price student-athletes receive for the use of their images is fixed at zero.  The alleged contract, combination, or conspiracy is a *per se* violation of federal antitrust laws and is, at a minimum, an unreasonable and unlawful restraint of trade.

174.  Defendants and the NCAA have engaged and continue to engage an overarching conspiracy to: (a) fix the amount current and former student athletes are paid for the licensing, use, and sale of their images at zero; and (b) foreclose current and former student athletes from the market for the licensing, use, and sale of their images.

175.  As a result of the Defendant's unlawful conduct, Plaintiffs and Class members have been injured.

## FIFTH CAUSE OF ACTION
### (False Endorsement in Violation of Section 43(A) the Lanham Act)
### Against Broadcast and Licensing Defendants

176.  Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

{01140122.1 }

34

177.    Section 43(a)(1)(A) of the Lanham Act states:

>   (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term name, symbol, or device, or any combination thereof . . . , which-

>   (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

>   shall be liable in a civil action by any person who believes that her or she is or is likely to be damaged by such act.

178.    Broadcast and Licensing Defendants have used, and continue to use, thousands of Class Members' names, images, and likenesses in connection with their advertisements for nationally televised airings of FBS football and NCAA Division I basketball games, for the explicit purpose of promoting the airings, increasing their brand awareness, and driving revenue to the Broadcast and Licensing Defendants.

179.    Broadcast and Licensing Defendants have used, and continue to use, thousands of Class Members' names, images, and likenesses in the nationally televised airings of FBS football and NCAA Division I basketball games.

180.    The names, images, and likenesses of many Class Members that Broadcast and Licensing Defendants use to promote their products are highly recognizable to consumers deciding whether to watch or order the Broadcast and Licensing Defendants' broadcasts of FBS football and Division I basketball games.  FBS football and Division I basketball players also wear uniforms, and numbers, making them easily identifiable to consumers.

181.    Broadcast and Licensing Defendants' use of Class Members' images in advertisements and nationally televised airings of FBS football and Division I basketball games has caused

actual confusion among members of the public as to Class Members' support and endorsement of Defendants' broadcasts.

182. The use of Class Members' images in Broadcast and Licensing Defendants' advertisements and televised airings constitutes a false endorsement in violation of Plaintiffs; and Class Members' rights under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

183. The actions by the Broadcast and Licensing Defendants constituting false endorsement have been willful and deliberate.

184. Broadcast and Licensing Defendants' false endorsements have been material; they deceive or are likely to deceive consumers.

185. As a direct and proximate result of Broadcast and Licensing Defendants' misconduct, Plaintiffs and Class Members have suffered injury.

**SIXTH CAUSE OF ACTION**
**(Unjust Enrichment Under Tennessee Law)**
**Against all Defendants**

186. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

187. Under Tennessee law, the elements of an unjust enrichment claim are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. The most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust.

188. As a result of Defendants' unlawful agreements, contracts, combinations, and conspiracy, Defendants have used, and continue to use, Plaintiffs' and Class Members' images to Defendants' benefit without compensating Plaintiffs and Class Members for such use.

{01140122.1 }

189.    Defendants' unauthorized use of Plaintiffs' and Class Members' names, images, and likenesses, perpetuated through their unlawful agreements, contracts, combinations, and conspiracies consequently has resulted in Plaintiffs and Class Members conferring a benefit upon Defendants.

190.    Defendants appreciated this benefit, and Defendants exploited it under such circumstances that it would be unjust and inequitable for them to retain it without compensating Plaintiffs and Class Members.

191.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and Class Members have been injured.

## SEVENTH CAUSE OF ACTION
### (Accounting)
### Against All Defendants

192.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

193.    Defendants have repeatedly misappropriated Plaintiffs' and Class Members' names, images, and likenesses to their commercial advantage and profited substantially from such use.

194.    By virtue of the foregoing, equity warrants that Defendants be compelled to provide Plaintiffs and Class Members with a detailed accounting of any and all profits, revenues, and consideration that in any way relates to Defendants' unauthorized use of the names, images, and likenesses of Plaintiffs and Class Members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray as follows:

A.    That the Court determine this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.     That Defendants' unauthorized use of Plaintiffs and Class Members' names, images and likenesses be adjudged to have been in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125(a));

D.     That Defendants' unauthorized use of Plaintiffs' and Class Members' names, images and likenesses be adjudged to violate Plaintiffs' and Class Members' rights of publicity under Tennessee common law and statute;

E.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to constitute an unlawful civil conspiracy under Tennessee law;

F.     That Defendants' unauthorized use of Plaintiffs and Class Members' names, images and likenesses be adjudged to constitute unjust enrichment under Tennessee law;

G.     That Plaintiffs and the Class be entitled to Accounting under Tennessee law;

H.     That a judgment be entered for Plaintiffs and Class Members against Defendants for the amount of all general damages sustained by Plaintiffs and the Class;

I.     That a judgment be entered for Plaintiffs and Class Members against Defendants for three times the amount of damages sustained by Plaintiffs and Class Members as a result of the violations herein alleged, which were willful and deliberate, together with the costs and expenses of this action, including reasonable attorneys' fees;

J.     That the Defendants be ordered to disgorge all profits earned via the wrongful use and sale of Plaintiffs and Class Members' images as described herein;

{01140122.1 }

38

K.      That Plaintiffs and Class Members be awarded any available prejudgment and post judgment interest, and that costs be taxed to Defendants;

L.      That the Court Declare relief declaring as void and unenforceable any releases that purport to have caused Plaintiffs and Class Members to relinquish rights to compensation for the use of their names, images or likenesses, and further declaring as void and unenforceable all licensing agreements that purport to represent that Plaintiffs and Class Members have released and/or agreed to released compensation rights for the use of their images;

M.      That Defendants, their affiliates, successors, transferees, assignees and officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

N.      That the Court find this to be an exceptional case under the Lanham Act entitling Plaintiffs and the Class to recover their reasonable attorneys' fees;

O.      That Plaintiffs and the Class be declared the prevailing parties on all counts; and

P.      That Plaintiffs and Class Members have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiffs demand a jury of their peers.

Respectfully submitted,

**BONE McALLESTER NORTON PLLC**

/s/ Stephen J. Zralek
Stephen J. Zralek, BPR #18971
John P. Branham, BPR #002552
511 Union Street, Suite 1600
Nashville, TN 37219
615.259.5508 telephone
szralek@bonelaw.com
jbranham@bonelaw.com

**STEWART JOHNSON CONNER &
MANSON, LLP**
Richard Manson, BPR #025025
Ronald A. Stewart, BPR # 23042
215 2nd Ave. North, Suite 300
Nashville, TN 37201

**McMURTRAY LAW FIRM, PLLC**

Patrick D. McMurtray, BPR #31597
P.O. Box 80
Christiana, Tennessee 37037

*Counsel for Plaintiffs*

{01140122.1 }

40