2014 WL 4347589
Only the Westlaw citation is currently available.
United States District Court,
M.D. Tennessee,
Nashville Division.

WATSON CARPET & FLOOR
COVERING, INC., Plaintiff,
v.
MOHAWK INDUSTRIES, INC., Defendant.

No. 3:09–cv–0487.  |  Filed Sept. 2, 2014.

**Attorneys and Law Firms**

R. Scott Jackson, Jr., Nashville, TN, for Plaintiff.

Randall Lee Allen, Rodney J. Ganske, Andrew J. Tuck, Alston & Bird LLP, Atlanta, GA, Timothy G. Harvey, Timothy L. Warnock, Riley, Warnock & Jacobson, Nashville, TN, for Defendant.

## MEMORANDUM

KEVIN H. SHARP, District Judge.

**\*1** Defendant Mohawk Industries, Inc. filed a motion for summary judgment (Docket Entry No. 116), to which Plaintiff Watson Carpet & Floor Covering, Inc. filed a response in opposition (Docket Entry No. 168). Defendant filed a reply (Docket Entry No. 189), and Plaintiff filed a sur-reply (Docket Entry No. 197).[1]

### I. *FACTUAL BACKGROUND*

Plaintiff Watson Carpet & Floor Covering, Inc. ("Plaintiff" or "Watson" or "Watson Carpet") is a local floor covering dealer with facilities in Brentwood, Tennessee, where it has been in business for 25 years. (Third Decl. of Johnny Watson, ¶ 2).[2] Plaintiff sells floor coverings, such as carpet, wood, and ceramic tile, to large production homebuilders, and installs the products in their homes. (*Id.*). Johnny Watson is the President and sole shareholder of Watson Carpet. (*Id.*). Plaintiff purchases carpet from carpet manufacturers such as Defendant Mohawk Industries, Inc. ("Defendant" or "Mohawk") and another manufacturer called Shaw Industries ("Shaw").[3]

Defendant Mohawk is a Georgia corporation that does business in Tennessee and throughout the United States. Mohawk supplies the carpet used in homes built by production homebuilders in the area. Mohawk markets a particular brand of carpet called—Portico exclusively to homebuilder customers. In the past, dealers carried Portico and pitched it to homebuilder customers just as they would pitch other Mohawk brands to individual consumers. In the 1990s, however, Mohawk and other carpet manufacturers also began directly negotiating to provide specialty homebuilder brands like Portico to large homebuilders on a regional and nationwide basis. Instead of dealers making these sales pitches on a local level, Mohawk makes the sales directly by pitching Portico to builders' regional or national offices.

When Mohawk makes contract sales to large national homebuilders, it still uses its dealer network to receive and install the Portico carpet for the homebuilders. Unlike traditional sales, the contract sales to large homebuilders are actually completed by the local dealer under Mohawk's national contract. The homebuilder selects which local Mohawk approved dealer will install the carpet. Dealers sell both Mohawk and Shaw carpet.

According to Defendant, in 1998, Mohawk contracted with Watson Carpet for one of its large homebuilder contracts—Newmark Homes. After noticing that Watson Carpet consistently supported Shaw and never brought any new homebuilder business to Mohawk, Mohawk decided to not sell it any new lines of Portico carpet. (Woods Decl. at ¶ 11). Watson Carpet could continue to service Newmark, but it would not receive any new homebuilder business that Mohawk generated. (*Id.*; Woods Depo., pp. 257–259).

In December 1998, Watson signed an agreement with Shaw to have Watson's sales of Shaw carpet produce 80% of its soft-floor covering purchases. However, according to Watson, the contract was for the purpose of participating in Shaw's rebate program. But when Watson learned that it would preclude him from participating in the FloorExpo rebate program in which Mohawk participated, the contract was quickly rescinded and Watson chose to keep participating in rebates with Mohawk rather than Shaw. (First Decl. of Watson at ¶ 11).

**\*2** In December 1998, the same month Watson signed his 80% agreement with Shaw, Mohawk secured a national contract to provide Portico to Centex Homes that became effective in January 1999. Mohawk told Centex it would not sell Portico through Watson for the Nashville region. Centex instead used two other local Nashville dealers, Metro Carpets and Carpet Den, to install Mohawk's Portico carpet. According to Mohawk, this decision was made because it perceived Watson to be a Shaw dealer that would try to switch Centex from Mohawk Portico to Shaw Home Foundations. (*Id.*). Watson, in contrast, believed Rick McCormick ("McCormick"), the owner of Carpet Den,[4] met with Defendant Mohawk's Vice President and Senior Manager, Brad Matthaidess ("Matthaidess"), and Mohawk sales representative Fred Woods ("Woods"), and devised a plan to run Plaintiff out of business and eliminate Plaintiff from the market. (Docket Entry No. 1 at ¶ 15). As part of the plan to run Plaintiff out of business, Mohawk would refuse to sell carpet to Plaintiff. By shutting off Plaintiff's carpet supply, Plaintiff would be unable to service its homebuilder customers who used Mohawk carpet. (*Id.*).

Watson Carpet ultimately sued Mohawk, Carpet Den, and McCormick in state court in 1999 for the Centex incident, alleging "tortious interference with business relationships and civil conspiracy."*Watson's Carpet & Floor Coverings, Inc. v. McCormick, et al.,* 247 S.W.3d 169, 173 (Tenn.Ct.App.2007). Out of an abundance of caution, because of the allegations, Mohawk completely removed Woods from any consideration of any decisions having to do with Watson in 1999. Other than conversations relating to the previous litigation, McCormick never discussed Watson with Woods or anyone else at Mohawk at any time between 2000 and 2008. (McCormick Depo., pp. 49–50).

According to Plaintiff, during the course of the state-court litigation, Mohawk had refused to sell to Watson for Newmark Homes in 2005 and Pulte Homes in 2006. After the settlement, in May 2007, Mohawk refused to fill Watson Carpet's order for Wieland Homes.[5] According to the Complaint, all three refusals were "[p]ursuant to and in furtherance of the conspiracy."(Docket Entry No. 1 at ¶¶ 32, 40, 48).

In the mid–1990s, Watson was one of the Nashville subcontractors for a company called Newmark Homes. In 2000, Watson was unable to compete on price with Carpet Den, and voluntarily dropped Newmark's carpet, hardwood, and vinyl business. In 2005, Newmark's warranty manager was James Rohling. Rohling used Watson for warranty work and tried to convince Newmark's area managers and purchasing managers—the Newmark employees who select flooring subcontractors for subdivisions—to try Watson again. (Docket Entry No. 119–14, First Decl. of Rohling, ¶ 3—4). Someone at Newmark approached someone at Mohawk about Newmark using Watson for some carpet installation. Mohawk's regional manager for Portico, Larry Brookshire ("Brookshire"), testified that Mohawk told Newmark that it would not sell Portico to Watson.

**\*3** Newmark Homes had no formal company policy of using a single dealer for all flooring types (tile, carpet, hardwood, vinyl, etc.). Between 2005 and 2008 Newmark Homes was using both Watson (for tile and warranty repairs in other scopes) and Carpet Den (for other scopes of work including carpet). If Newmark was not satisfied with Mohawk's dealer selection, it had the ability to switch to using Shaw carpet, which it eventually did anyway in 2008.

In 2006, Mohawk, Shaw, and other carpet manufacturers competed to secure business from Pulte Homes, and after that competition and negotiation, Pulte entered a national agreement to only use Mohawk's Portico in Pulte subdivisions nationwide. Up until the time that Pulte entered into a national agreement with Mohawk, Watson supplied Pulte with Shaw carpet. Pulte's sales manager, Chad Nichols ("Nichols"), called Fred Woods to see if Mohawk would sell Portico thru Watson. Because Woods had been removed from any decision impacting Watson, he immediately told Nichols he could not discuss the issue with Nichols and that he would have someone else call. Ultimately, because of Mohawk's past history with Watson, Jonathan England ("England"), Mohawk's regional manager for Portico carpet, called Nichols back and told him that Mohawk would not sell Portico to Watson. (First Decl. of Nichols at ¶ 6; England Depo., pp. 26–27, 38—39). Mohawk's contract with Pulte ended on January 1, 2011.

## II. *RELEVANT PROCEDURAL HISTORY*

Watson brought a law suit against Mohawk, Carpet Den, and Rick McCormick in the United States District Court for the Middle District of Tennessee on May 27, 2009, alleging three violations of Section 1 of the Sherman Act based on the 2005 (Newmark), 2006 (Pulte), and 2007 (Wieland) refusals to sell. (Docket Entry No. 1). Mohawk filed a motion to dismiss for failure to state a claim, asserting that the claims were

time-barred and that the Complaint was inadequate under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). (Docket Entry No. 14). The Honorable Thomas Wiseman granted the motion to dismiss, holding that the claims were not time barred, but that the Complaint was not particular about whether the 2005, 2006, and 2007 events were related to the original conspiracy or were unilateral refusals to sell to a litigious customer.[6] Carpet Den and McCormick filed a motion for summary judgment or, alternatively, judgment on the pleadings due to the same statute-of-limitations argument that Mohawk raised, and also alleging that the settlement release barred the claims. Judge Wiseman granted the motion for summary judgment insofar as the settlement release applied to the 2005 and 2006 counts. However, Judge Wiseman concluded that the settlement release did not apply to the 2007 count, which took place after the parties had signed the release. Judge Wiseman also determined that the 2007 count fell within the four-year statute of limitations. Judge Wiseman dismissed the 2007 count against Carpet Den and McCormick for failure to state a claim.

*4 Watson Carpet filed a motion for consideration, to which Judge Wiseman denied. Watson Carpet appealed to the Sixth Circuit Court of Appeals. Carpet Den and McCormick cross-appealed Judge Wiseman's determination that the settlement agreement did not bar the 2007 count. The Sixth Circuit reversed the dismissal of the Complaint and held that Watson Carpet adequately stated a claim for relief. With respect to the cross-appeal, the Sixth Circuit affirmed Judge Wiseman's determination that the 2007 refusal to sell is outside the scope of the settlement release. The Sixth Circuit held, "when they settled with Watson Carpet, Carpet Den and McCormick bargained away their liability for the 1999, 2005, and 2006 refusals to sell. They did not withdraw from the conspiracy, however, and conspiracies are presumptively ongoing. As coconspirators with Mohawk, Carpet Den and McCormick remain liable for Mohawk's postrelease actions that furthered the conspiracy, including the 2007 refusal to sell."*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.,* 648 F.3d 452 (6th Cir.2011).*See* also (Docket Entry No. 51). Both Carpet Den and McCormick have since been dismissed from this law suit. *See* (Docket Entry Nos. 70 and 71).

## III. *STANDARD OF REVIEW*

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See*Fed.R.Civ.P. 56(c); *Covington v. Knox County School Sys.,* 205 F.3d 912, 914 (6th Cir.2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley,* 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Covington,* 205 F.3d at 914 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed.R.Civ.P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson,* 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[7]

## IV. *ANALYSIS*

*5 Defendant argues that the Court lacks subject matter jurisdiction over this suit because Plaintiff cannot show a substantial effect on interstate commerce—and as such, it is entitled to summary judgment. Furthermore, Defendant claims it is entitled to summary judgment on the Sherman Act claim because Plaintiff cannot satisfy the elements required for such claim. The Court will address the jurisdictional issue then consider Plaintiff's Sherman Act claim in turn.

### A. Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction,

Case 3:14-cv-01945   Document 268-1   Filed 03/06/15   Page 3 of 8 PageID #: 2261

and the burden of establishing the contrary rests upon the party asserting jurisdiction."*Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *see also Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) ( "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 701, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) ("Federal courts are courts of limited jurisdiction. The character of the controversies over which federal judicial authority may extend are delineated in Art. III, § 2, cl. 1. Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction."); *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 ("It is a fundamental precept that federal courts are courts of limited jurisdiction.").

Federal courts are obliged to act *sua sponte* whenever a question about jurisdiction arises. *See, e.g., Ins. Corp. of Ireland, Ltd.,* 456 U.S. at 702 (stating that "a court, including an appellate court, will raise lack of subject-matter jurisdiction on its own motion"); *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 287 n. 10, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *Answers in Genesis, Inc. v. Creation Ministries Int'l, Ltd.,* 556 F.3d 459, 465 (6th Cir.2009) ("[F]ederal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte.*" ). Under Rule 12(h)(3) of the Federal Rules of Civil Procedure, "[i]f the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action."

Defendant claims it is entitled to summary judgment because this lawsuit "is an entirely local dispute in the Nashville area, so there is no "substantial effect" on interstate commerce to create jurisdiction under the federal antitrust laws."(Docket Entry No. 134 at 3). Defendant continues, nor has Plaintiff "[ ] alleged, and cannot show any effect on interstate commerce."(*Id.* at 26). Further, Defendant is of the opinion that, "[i]n 2009, Watson decided, as they say, to make a federal case out of it. Watson dusted off his 1999 complaint and reframed it to allege that Mohawk decisions not to re-open Watson as a Portico dealer were the product now of a *federal antitrust* conspiracy between Mohawk and Carpet Den. Dkt. No. 1."(*Id.*)(italics in original). Plaintiff counters that it has certainly shown "Defendant's business activity is in interstate commerce and has an effect on other activity in interstate commerce;" the acts "affected interstate commerce;" and there would be subsequent "effects to interstate commerce if the ultimate goal of the conspiracy were successful."(Docket Entry No. 170 at 32). In support Plaintiff contends,

> *6 Defendant is located in Georgia and sells and ships carpet and other floor coverings throughout the United States. Complaint, para. 4; Answer, para. 4. All product that Plaintiff received from Mohawk was shipped from out of state across Tennessee state lines, and Mohawk's refusals to sell stopped the flow of millions of dollars worth of products across state lines. Third Decl. of Watson, para. 24. When Mohawk refused to sell Plaintiff in 2004–07, those refusals were made over the telephone lines through calls between Tennessee and Georgia. *Id.,* para. 24.The 1998 conspiracy involved parties in Tennessee and Georgia conspiring to refuse to sell in Tennessee. See, e.g., Third Decl. of Watson, para. 24. Three of the individuals at Mohawk implicated in the conspiracy were working in Georgia at the time: Brad Mathaidess, Dale Byers, and Scott Hutchings. Third Decl. of Watson, para. 24. The letter from Larry Brookshire closing Plaintiff's account with Mohawk came from Georgia and was sent across state lines using the U.S. Mail. Third Decl. of Watson, para. 24; See, Brookshire letter. If Plaintiff is run out of business, it will stop the flow of millions of dollars worth of additional products and other business interstate business. Third Decl. of Watson, para. 24.

(*Id.* at 30–31).

Both parties rely on *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) and *Summit Health, Ltd., v. Phinas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) in an effort to convince this Court of their respective arguments. In *McLain,* the Supreme Court addressed whether a class of individual

real estate vendors and purchasers could bring an antitrust action against real estate brokers under the Sherman Act. *McLain,* 444 U.S. at 234. The Court ultimately held that the plaintiffs had established jurisdiction under the Sherman Act because they had sufficiently alleged a relationship between themselves, the transactions involved, and interstate commerce. *Id.* at 245–246.

In *Phinas,* the Supreme Court considered the antitrust claim of an opthamologist whose medical privileges were revoked after he refused to use an assistant surgeon-resulting in higher costs for himself-during procedures that he performed at the hospital. The physician was known throughout the industry for his skill and speed in these types of surgeries, and he argued that requiring him to provide an assistant at his own cost was unnecessary and improper. *Phinas,* 500 U.S. 326–327.The hospital engaged in a peer review process that ended with the revocation of his medical privileges. The Court found the doctor's claims "that members of the peer review committee conspired with others to abuse th[e] process and thereby deny [him] access to the market ... ha[d] a sufficient nexus with interstate commerce to support federal jurisdiction. *Id.* at 333.Thus, the interstate commerce requirement of antitrust jurisdiction was satisfied.

After a thorough reading of Plaintiff's Complaint as well as the papers filed in support of its response to the pending motion, the Court finds Plaintiff has identified a relevant aspect of interstate commerce and alleges the interrelationship between Defendant's activities and interstate commerce. Therefore, the Court finds Plaintiff has successfully stated a viable claim arising under federal law, and therefore the Court has jurisdiction under 28 U.S.C. § 1331, which provides for federal jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."Accordingly, the Court will not dismiss Plaintiff's Sherman Act claim on jurisdictional grounds.

**B. Sherman Act Claim**

*7 Defendant next argues it is entitled to summary judgment on Plaintiff's Sherman Act claim because "Watson adduced no evidence that [there was an ongoing conspiracy] [nor that] the alleged conspiracy had a "significant anticompetitive effect" in the relevant antitrust market."(Docket Entry No. 134 at 3). Plaintiff disagrees. Plaintiff insists Mohawk's actions in refusing to sell Plaintiff the carpet required by Newmark Homes and Pulte Homes, was "pursuant to and in furtherance of the conspiracy, Plaintiff was injured" and caused "economic damage in violation of Section 1 of the Sherman Act."(Docket Entry No. 1 at ¶¶ 33 and 34).

The Sherman Act provides, in part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."15 U.S.C. § 1. Although it "literally prohibits every agreement 'in restraint of trade,' "*Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 342, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints."*State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

Whether an agreement unreasonably restrains trade is determined under one of two approaches: the *per se* rule and the rule of reason. *Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Association,* 388 F.3d 955, 959 (6th Cir.2004).[8] In *per se* cases, evidence of actual effect on competition is not required because these actions are conclusively presumed to be unreasonable. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Northern Pacific Railway Company v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). A restraint on trade is *per se* illegal when "the practice facially appears to be one that would almost always tend to restrict competition and decrease output."*National Collegiate Athletic Association v. Bd. of Regents of Univ. Of Oklahoma,* 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (citations omitted).

"There is a presumption in favor of a rule-of-reason standard,"*Business Elec. Corp. v. Sharp Elec. Corp.,* 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). The rule of reason analysis, "requires the court to analyze the actual effect on competition in a relevant market to determine whether the conduct unreasonably restrains trade,"*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F.3d 430, 436 (6th Cir.2008), because the very "essence of the Section 1 rule of reason analysis is whether the challenged agreement is one that promotes competition or one that suppresses competition."*White & White, Inc. v. Am. Hosp. Supply Corp.,* 723 F.2d 495, 505 (6th Cir.1983) (citation omitted)."This query must be resolved by distinguishing between conduct that injures competition and that which may injure competitors."*Id.* Thus, it is necessary for a court "to examine both the history of the restraint, and the restraint's effect on competition."*Care Heating & Cooling, Inc. v. Am. Standard, Inc.,* 427 F.3d 1008, 1012 (6th

Cir.2005). The Court will address Plaintiff's Sherman Act claim under the rule of reason.

**\*8** "In order to establish a prima facie case under the rule of reason, the plaintiff must prove (1) that the defendants contracted, combined, or conspired; (2) that the scheme produced anticompetitive effects; (3) that the restraint affected relevant product and geographic markets; (4) that the object of the scheme and the conduct resulting from it was illegal; and (5) that the scheme was a proximate cause of the plaintiff's antitrust injury."*Expert Masonry, Inc. v. Boone County,* 330 F.3d 336, 342 (6th Cir.2006) (citation omitted)."If the plaintiff satisfies this prima facie test, the burden shifts to the defendant to 'come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitive injuries;' if the defendant successfully makes this showing, the plaintiff 'then must show that any legitimate objectives can be achieved in a substantially less restrictive manner.'"*Id.* (citations omitted).

### The Alleged Conspiracy

A conspiracy may be established through direct or indirect (circumstantial) evidence. *See, Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984); *Wallace v. Bank of Bartlett,* 55 F.3d 1166, 1168 (6th Cir.1995); *Riverview Invest. Inc. v. Ottawa Comm. Corp.,* 899 F.2d 474, 482 (6th Cir.1990)."Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'"*Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 226 (3rd Cir.2011). Direct evidence of a conspiracy is generally shown by such things as an explicit "admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy,"*In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 628 (7th Cir.2010), or by "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators," or by "a direct threat to the plaintiff from a competitor."*TruePosition, Inc. v. LM Ericsson Tele. Co.,* 844 F.Supp.2d 571, 593 (E.D.Pa.2012) (collecting cases).

Defendant contends it unilaterally made the decision not to reengage in a business relationship with Watson in connection with the Newmark or Pulte accounts. (Docket Entry No. 134 at 1). Defendant continues, "it had no remotely plausible economic motive to conspire with Carpet Den." Mohawk did, nevertheless, "have compelling economic motivations for declining any invitation to renew its business relationship with Watson—Mohawk perceived Watson as an almost-exclusive Shaw dealer, and Watson forced Mohawk into 8 years of litigation in state court."(*Id.* at 11).

Moreover, Defendant explains, any evidence presented about Mohawk's activity in 1998 does not omit the possibility of independent action by Mohawk more than half a decade later, in 2005 and 2006, because "(1) it is undisputed that Fred Woods was removed from any Mohawk decisions concerning Watson after the first lawsuit was filed in 1999, SOF 23, and (2) it is undisputed that, whatever evidence existed of a "conspiracy" in 1998, Mohawk unequivocally withdrew through its testimony publicly communicated to Mr. McCormick and everyone else in open court during the 2004 trial."(*Id.*).

**\*9** Plaintiff counters, "the fact that Mohawk took the very actions contemplated by the conspiracy is evidence that the refusals to sell were pursuant to the conspiracy."(Docket Entry No. 170 at 10). Although Defendant offers evidence that its refusals were for some other reason, Plaintiff argues, "this evidence is disputed by the evidence of a detailed conspiracy to run Plaintiff out of business by refusing to sell, and Defendant's conduct in doing exactly what it conspired to do."(*Id.*).

The parties have committed a substantial part of their briefs to their argument as to whether or not there is genuine issue of material fact with respect to the alleged conspiracy by Defendant. The Court finds that there are genuine issues of material fact with respect to the conspiracy claims of Plaintiff, which require that those claims be submitted to the jury.

### *Anticompetitive Effect and the Relevant Products and Geographical Market*

Because the Sherman Act was intended to protect competition and the market as a whole, not individual competitors, *NHL Players' Ass'n v. Plymouth Whalers Hockey Club,* 325 F.3d 712, 720 (6th Cir.2003) (citing *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)), the foundation of an antitrust claim is the alleged adverse effect on the market. Before reaching the merits of an antitrust claim, it is necessary to identify the relevant market. *Potters Medical Center v. City Hosp. Ass'n,* 800 F.2d 568, 574 (6th Cir.1986); *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 954 (6th Cir.1983).

The plaintiffs bear the burden of defining "the relevant market within which the alleged anticompetitive effects" of the defendants' actions occur. *See Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.,* 588 F.3d 908, 916 (6th Cir.2009); *Worldwide Basketball & Sport Tours, Inc.,* 388 F.3d at 962 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.") (quoting *NHL Players' Assoc.,* 325 F.3d at 719–20).

According to Defendant, Plaintiff has also failed to meet its burden to show the relevant geographic and product markets in which Mohawk's behavior allegedly has a significant anticompetitive effect. (Docket Entry No. 134 at 14). Defendant "is [ ] entitled to summary judgment because, even assuming the relevant market as alleged, removing Watson as a Portico dealer had no significant anticompetitive effects on that market."(*Id.*). "At its heart," Defendant asserts, this is simply a case about "whether this Court will force Mohawk to have a business relationship with Watson—to use Watson as a middle-man even though he is litigious and perceived as being almost totally aligned with Mohawk's largest competitor."(*Id.* at 16).

In contrast, Plaintiff claims it has presented material evidence "that a definable market was affected by Mohawk's refusal to sell: the distribution of installed carpet sold to production homebuilders in the Nashville area."(Docket Entry No. 170 at 14). "Production homebuilders," according to Plaintiff, "are defined as those who build over 100 homes per year in the Nashville area, which is defined as the counties of Davidson, Williamson, Rutherford, Wilson, and Sumner."(*Id.*). According to Plaintiff, "during the period from 1998–2007, only two carpet suppliers, Mohawk and Shaw, supplied approximately 95% of the carpet in this market, while only three dealers were capable of servicing the production homebuilders in the market: Carpet Den, Watson Carpet, and Metro Carpets."(*Id.*).

*10 Defendant raises important issues; however, they appear to this Court to involve disputed factual issues, which must be resolved by a jury. Furthermore, Plaintiff has presented sufficient evidence to raise a material question of fact as to both the anticompetitive effect and relevant market.

*Antitrust Injury*
Finally, Plaintiff must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."Antitrust injury must be attributable to an anticompetitive aspect of the practice under scrutiny. *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). In *In re Cardizem CD Antitrust Litigation,* 332 F.3d 896, 909 (6th Cir.2003), the Sixth Circuit defined an "antitrust injury" as one proximately caused by a defendant's allegedly illegal conduct and "of the type the antitrust laws were intended to prevent."*See Care Heating & Cooling, Inc.,* 427 F.3d at 1015.

Defendant argues it is also entitled to summary judgment because Watson cannot show antitrust injury. (Docket Entry No. 134 at 25, 27). Defendant contends,

> [t]he only injury Plaintiff alleges are his lost profits from not being a dealer in Mohawk's well populated network. The only potential antitrust injury alleged, on the other hand, is the builders' potentially having to use a non-preferred supplier or potentially having to pay higher prices because Watson is not competing for their sales. *See id.* at 338 (refusing to hold that competitor's "loss of profits" constituted antitrust injury) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 116, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)). Pulte Homes's former sales manager Chad Nichols admits that Pulte did not suffer any antitrust injury.

(*Id.* at 25).

Ultimately, Plaintiff argues that there are genuine issues of material fact to be decided by the jury, which preclude a finding concerning antitrust injury as a matter of law. Defendant, on the other hand, argues that there is no genuine issue of material fact, and that the Court should grant judgment as a matter of law. The Court finds genuine questions of material fact do exist requiring the question of antitrust injury to be submitted to the jury.

Having found that there are sufficient genuine disputes of material fact as to Plaintiff's Sherman Act claim, summary judgment should be denied.

### V. *CONCLUSION*

For all of the reasons stated, Defendant's motion for summary judgment (Docket Entry No. 116) is hereby denied.

An appropriate Order shall be entered.

**ORDER**

For the reasons explained in the Memorandum entered contemporaneously herewith, *Defendant Mohawk Industries, Inc.'s Motion for Summary Judgment* (Docket Entry No. 116) is hereby DENIED. Furthermore, *Plaintiff's Motion to Ascertain Status* (Docket Entry No. 254) is hereby DENIED as moot.

It is SO ORDERED.

Footnotes

1. The Court also heard oral arguments from the parties and has considered that in its analysis of the motion.
2. Unless otherwise noted, the facts are drawn from *Plaintiff's Response to Defendant's Statement of Undisputed Facts, Defendant Mohawk Industries, Inc.'s Reply Statement of Material Facts As To Which There Is No Genuine Issue for Trial* (Docket Entry Nos. 169 and 190), declarations and other related exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir.2000).
3. Shaw is Mohawk's primary competitor in the flooring manufacturing business. Shaw competes with Mohawk's Portico brand by pitching its own homebuilder-specific line of flooring called Home Foundations to homebuilders.
4. Former Defendant in this lawsuit, Carpet Den, is also an independent dealer of carpet and other floor coverings in the Nashville area. Carpet Den also sells carpet and other floor coverings to homebuilders and retail customers, and installs these floor coverings in its customers' houses. The majority of Carpet Den's revenues come from sales to its homebuilder customers.
5. Watson also initially brought a claim relating to the Mohawk's 2007 dealings with John Wieland Homes, but Watson has dropped that claim. *See* (Docket Entry No. 96).
6. The case was reassigned to this Court by Order entered on August 31, 2011. *See* (Docket Entry No. 67).
7. **Error! Main Document Only.**Although the foregoing is the general standard for considering summary judgment motions, the Court notes that, "[i]n this circuit, motions for summary judgment are disfavored in antitrust litigation,"*Smith v. Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir.2007), because of "the critical 'role that intent and motive have in antitrust claims[.]"*Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 341 (6th Cir.2006).
8. The Sixth Circuit has characterized an approach called the "quick look" analysis as a third type of category arising from the "blurring of the line between *per se* and rule of reason cases."*See In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262 (6th Cir.2014) (citing *Expert Masonry*, 440 F.3d at 343)."This less-rigid approach aligns with the Supreme Court's recognition of the value of the "quick look" approach as an abbreviated form of the rule of reason analysis used for situations in which "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.""*Id.* (citing *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999)). Applying this test is useful when the anticompetitive nature of an agreement is so blatant that a detailed review of the surrounding marketplace would be unnecessary. *Id.* at 769–70, 526 U.S. 756, 119 S.Ct. 1604, 143 L.Ed.2d 935.

End of Document © 2015 Thomson Reuters. No claim to original U.S. Government Works.