# EXHIBIT 1

2014 WL 5106738
Only the Westlaw citation is currently available.
United States District Court,
D. Minnesota.

John Frederick DRYER, Elvin Lamont
Bethea, and Edward Alvin White, Plaintiffs,
v.
NATIONAL FOOTBALL LEAGUE, Defendant.

Civil No. 09–2182 (PAM/
FLN).    |    Signed Oct. 10, 2014.

**Synopsis**
**Background:** Former professional football players brought
action against National Football league (NFL), alleging
that league's use of video footage of players in television
productions violated their publicity rights, caused consumer
confusion, and unjustly enriched the league. Both parties
moved for summary judgment.

**Holdings:** The District Court, Paul A. Magnuson, J., held
that:

[1] productions were not commercial speech;

[2] First Amendment protections outweighed players'
publicity rights;

[3] newsworthiness defense barred state publicity-rights
claims;

[4] Copyright Act preempted state publicity-rights claims;

[5] productions' use of players' likenesses was not false or
misleading in violation of Lanham Act.

Ordered accordingly.

West Headnotes (32)

[1]     **Constitutional Law**
         Commercial Speech in General

To determine whether the speech at issue
is commercial speech, a court must evaluate
the content, form, and context of the speech
as revealed by the whole record. U.S.C.A.
Const.Amend. 1.

Cases that cite this headnote

[2]     **Constitutional Law**
         Questions of Law or Fact

The ultimate question of whether speech is
commercial is a question of law. U.S.C.A.
Const.Amend. 1.

Cases that cite this headnote

[3]     **Constitutional Law**
         Right of Publicity;  Misappropriation of
        Likeness, Name, or Celebrity Status
        **Constitutional Law**
         Program Content
        **Torts**
         Defenses in General

Television productions recounting professional
football games were not commercial speech,
and thus were fully protected speech in context
of former players' claims that the productions
violated their publicity rights; although National
Football League (NFL) had an economic interest
in creating the productions, the league did
not pay television networks to broadcast the
productions, the productions used the players'
footage merely because the games could not
be described visually any other way, and the
productions did not reference a separate product
or service. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[4]     **Constitutional Law**
         What Is "Commercial Speech"

Although speech that does no more than
propose a commercial transaction is by definition
commercial speech, other speech may be deemed
commercial even though it does not explicitly
propose a commercial transaction. U.S.C.A.
Const.Amend. 1.

Cases that cite this headnote

**[5]** **Constitutional Law**
👉 Books

**Constitutional Law**
👉 Motion Pictures and Videos

That movies, books, or other expressive works are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[6]** **Constitutional Law**
👉 Right of Publicity; Misappropriation of Likeness, Name, or Celebrity Status

**Constitutional Law**
👉 Program Content

**Torts**
👉 Defenses in General

First Amendment protections of television productions recounting professional football games outweighed publicity rights of former National Football League (NFL) players who appeared in the productions; the productions' use of the players' likenesses was similar to permitted use of game footage by sports news broadcasts or newspapers, and there was no danger that consumers would falsely believe that the players were engaged in an activity other than playing football. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[7]** **Torts**
👉 What Law Governs

District court in Minnesota would not apply New Jersey law to publicity-rights claims brought by former professional football players against National Football League (NFL) related to television productions recounting historical football games; although league subsidiary that made the productions was headquartered in New Jersey, there was no indication that the players had any contacts with New Jersey.

Cases that cite this headnote

**[8]** **Torts**
👉 Elements of the Tort in General

Under California's common law, a claim for violation of publicity rights has four elements: (1) the defendant's use of plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.

Cases that cite this headnote

**[9]** **Torts**
👉 Elements of the Tort in General

Under Texas law, a plaintiff raising a claim for a violation of his publicity rights must establish: (1) the defendant misappropriated the plaintiff's name or likeness for the value associated with it and not in an incidental manner or for a newsworthy purpose; (2) the plaintiff can be identified from the publication; and (3) the defendant derived some advantage or benefit.

Cases that cite this headnote

**[10]** **Torts**
👉 Elements of the Tort in General

Minnesota's tort of appropriation is committed when one appropriates to his own use or benefit the name or likeness of another; the use is not required to have a commercial purpose, and appropriation may occur even though the benefit sought is not a pecuniary one. Restatement (Second) of Torts § 652C.

Cases that cite this headnote

**[11]** **Torts**
👉 Nature and Extent of Right

The right of publicity under New York law derives solely from statute. N.Y.McKinney's Civil Rights Law § 51.

Cases that cite this headnote

WestLaw © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2

**[12]** **Torts**

👉 Matters of Public Interest or Public Record; Newsworthiness

Under California law, liability will not lie for common law right-of-publicity claims for the publication of matters in the public interest.

Cases that cite this headnote

**[13]** **Torts**

👉 Matters of Public Interest or Public Record; Newsworthiness

Newsworthiness defense barred publicity-rights claims brought by former football players under California law related to National Football League's (NFL) use of footage containing players in television productions recounting historical football games; productions conveyed only true, albeit dramatized, information about real games, and the games commanded substantial public interest. West's Ann.Cal.Civ.Code § 3344(d).

Cases that cite this headnote

**[14]** **Torts**

👉 Matters of Public Interest or Public Record; Newsworthiness

Under California law, both the statutory and common-law newsworthiness defenses to a right-of-publicity claim protect only the act of publishing or reporting. West's Ann.Cal.Civ.Code § 3344(d).

Cases that cite this headnote

**[15]** **Torts**

👉 Matters of Public Interest or Public Record; Newsworthiness

Texas law exempts from its publicity-rights claim any use for a newsworthy purpose.

Cases that cite this headnote

**[16]** **Torts**

👉 Matters of Public Interest or Public Record; Newsworthiness

The newsworthiness defense to a publicity-rights claim under Texas law is broad and extends beyond subjects of political or public affairs to all matters of the kind customarily regarded as news and all matters giving information to the public for purposes of education, amusement or enlightenment, where the public may reasonably be expected to have a legitimate interest in what is published.

Cases that cite this headnote

**[17]** **Torts**

👉 Questions of Law or Fact

Under Texas law, the determination of what is newsworthy in context of a publicity-rights claim may be made as a matter of law.

Cases that cite this headnote

**[18]** **Torts**

👉 Matters of Public Interest or Public Record; Newsworthiness

Newsworthiness defense barred publicity-rights claims brought by former professional football player under Texas law related to National Football League's (NFL) use of footage containing player in television productions recounting historical football games; productions' use of player's image was the only way for the league to visually inform the public about historical football games.

Cases that cite this headnote

**[19]** **Torts**

👉 Matters of Public Interest or Public Record; Newsworthiness

Under Minnesota law, as predicted by district court, newsworthiness defense barred publicity-rights claims brought by former professional football player related to National Football League's (NFL) use of footage containing player in television productions recounting historical football games; use of player's identity was a matter of public interest and was for the purpose of giving information to the public.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Cases that cite this headnote

[20] **Constitutional Law**
👉 Right of Publicity; Misappropriation of Likeness, Name, or Celebrity Status

**Torts**
👉 Matters of Public Interest or Public Record; Newsworthiness

New York limits its statutory privacy-rights claim to publications that do not concern newsworthy events or are not in the public interest; this newsworthiness exception is both a matter of legislative intent and a reflection of constitutional values in the area of free speech and free press. N.Y.McKinney's Civil Rights Law § 51.

Cases that cite this headnote

[21] **Torts**
👉 Matters of Public Interest or Public Record; Newsworthiness

The newsworthiness exception to privacy-rights claims under New York law should be liberally applied. N.Y.McKinney's Civil Rights Law § 51.

Cases that cite this headnote

[22] **Torts**
👉 Conduct or Misappropriation Actionable in General

Under New York law, judicial intervention should occur in privacy-rights cases only in those instances where there is no real relationship between the plaintiff's image and the use of that image, or where the use is an advertisement in disguise. N.Y.McKinney's Civil Rights Law § 51.

Cases that cite this headnote

[23] **Torts**
👉 Matters of Public Interest or Public Record; Newsworthiness

Newsworthiness defense barred publicity-rights claims brought by former professional football player under New York law related to National Football League's (NFL) use of footage containing player in television productions recounting historical football games; player's performance in the league was a subject of public interest, which was related to the productions' depictions of the player's games, and the productions were not advertisements in disguise.

Cases that cite this headnote

[24] **Torts**
👉 Waiver or Consent

Under California law, lack of consent is an element of a claim for violation of publicity rights.

Cases that cite this headnote

[25] **Torts**
👉 Waiver or Consent

Former professional football players consented to National Football League's (NFL) use of game footage in which they appeared in television productions recounting historical football games, and thus could not recover on publicity-rights claims against league under California, Texas, or Minnesota law; players voluntarily and willingly appeared in interviews related to the productions, and believed the league had the right to use the footage or knew it was using the footage and did not object.

Cases that cite this headnote

[26] **States**
👉 Particular Cases, Preemption or Supersession

**Torts**
👉 Preemption

Copyright Act preempted publicity-rights claims brought by former professional football players related to National Football League's (NFL) use of footage containing players in television productions that recounted historical football games; although the games themselves were not copyrightable, the game footage was copyrightable, the players' likenesses could

not be detached from the footage, and the league had the right to use the footage in expressive derivative works such as the television productions. 17 U.S.C.A. § 301.

Cases that cite this headnote

**[27]    Torts**

🔑 Conduct or Misappropriation Actionable in General

A claim for a violation of the right to publicity against a copyrighted work will lie only if that work is used for advertising, not in an expressive work.

Cases that cite this headnote

**[28]    Antitrust and Trade Regulation**

🔑 Sponsorship, Approval, or Connection, Representations Concerning

The Lanham Act's protections against false endorsement apply only if the speech involved is commercial speech. U.S.C.A. Const.Amend. 1; Lanham Act, § 43(a)(1)(A), 15 U.S.C.A. § 1125(a)(1)(A).

Cases that cite this headnote

**[29]    Antitrust and Trade Regulation**

🔑 Sponsorship, Approval, or Connection, Representations Concerning

Even if television productions recounting historical football games were commercial speech, productions' use of former players' likenesses was not false or misleading, precluding recovery for players on their false endorsement claims against National Football League (NFL) under the Lanham Act; the productions showed the players engaged in their former profession, and the players were affiliated with the league when the footage was shot. Lanham Act, § 43(a)(1)(A), 15 U.S.C.A. § 1125(a)(1)(A).

Cases that cite this headnote

**[30]    Equity**

🔑 Prejudice from Delay in General

Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted.

Cases that cite this headnote

**[31]    Antitrust and Trade Regulation**

🔑 Delay in Assertion of Rights; Laches

A delay of more than six years in bringing Lanham Act suit raises presumption that delay is unreasonable, inexcusable, and prejudicial, for purposes of laches defense; the plaintiff must rebut that presumption by producing evidence either that the delay was reasonable or excusable or that the defendant suffered no prejudice. Lanham Act, § 43(a)(1)(A), 15 U.S.C.A. § 1125(a)(1)(A).

Cases that cite this headnote

**[32]    Antitrust and Trade Regulation**

🔑 Delay in Assertion of Rights; Laches

Doctrine of laches barred former professional football players' false endorsement claims against National Football League (NFL) under the Lanham Act related to television productions recounting historical football games; players' ignorance of law could not excuse lengthy delay in filing suit, and there was no indication that the league was not prejudiced by the delay. Lanham Act, § 43(a)(1)(A), 15 U.S.C.A. § 1125(a)(1)(A).

Cases that cite this headnote

**Attorneys and Law Firms**

Jeffrey S. Gleason, Thomas C. Mahlum, Mathew R. Korte, Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, MN, Robert A. Stein, Bob Stein, LLC, Minnetonka, MN, for Plaintiffs.

Bruce P. Keller, Michael Schaper, Debevoise & Plimpton, LLP, New York, NY, Aaron D. Van Oort, Daniel J. Connolly, David J.F. Gross, Eileen M. Hunter, Faegre Baker Daniels LLP, Minneapolis, MN, for Defendant.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

## MEMORANDUM AND ORDER

PAUL A. MAGNUSON, District Judge.

*1 This matter is before the Court on the parties' Motions for Summary Judgment. Plaintiffs seek partial summary judgment on several of Defendant National Football Leagues's affirmative defenses. The NFL asks for summary judgment on all of Plaintiffs' claims. For the reasons that follow, Plaintiffs' Motion is denied and the NFL's Motion is granted.

### BACKGROUND

Plaintiffs John Frederick Dryer, Elvin Lamont Bethea, and Edward Alvin White played professional football for Defendant National Football League. In this lawsuit, initially brought as a class action, Plaintiffs allege that NFL Films' use of video footage of them playing football violates their publicity rights, causes consumer confusion, and unjustly enriches the NFL.

Dryer played for the New York Giants from 1969 to 1971, and for the Los Angeles Rams [1] from 1972 to 1981. Footage of games in which Dryer played appears in 47 different NFL Films productions. Bethea played for the Houston Oilers [2] from 1968 until 1983. Thirty-two NFL Films productions include game footage in which Bethea appears as a player. White played for the Minnesota Vikings from 1969 to 1977, and for the San Diego Chargers from 1978 to 1985. Footage from games in which White played appears in 91 NFL Films productions. Dryer and White currently live in California; Bethea lives in Texas.

NFL Films productions are essentially compilations of clips of game footage into theme-based programs describing a football game or series of games and the players on the field. But the productions are more than just highlight reels; as one magazine put it, the productions' "artistry" "altered forever the way sports is presented on film." David Lidsky, *This is NFL Films,* Fortune, Sept. 16, 2002 (Connolly Aff. Ex. V). The productions do not use footage from the television cameras that broadcast the game, but rather use NFL Films-dedicated cameras, with camera operators who choose what and whom to feature, in order to " 'best tell the story of the game.' " *Id.* (quoting Steve Andrich, Vice President of Cinematography for NFL Films). Most of the productions at

issue here describe a single football game or football season, creating a 20– to 30–minute dramatic narrative featuring music, narration, and clips of important plays from the game itself in real time and slow motion.

Some productions also contain interviews with players, further enhancing the narrative. Plaintiffs each participated in these interviews after they retired: Dryer gave four post-retirement interviews to NFL Films, Bethea gave three interviews, and White gave one interview. In each case, they willingly participated in the interview and understood that the interview would be incorporated into NFL Films productions. (*See, e.g.,* Bethea Dep. (Connolly Aff. Ex. G) at 93 ("I guess the thing was, I just was glad to be interviewed.").) And in at least some cases, they signed waivers related to NFL Films' use of their interviews. (*See, e.g.,* Dryer Dep. (Connolly Aff. Ex. F) at 173 (discussing "Guest/Performer Release" for Dryer's interview for the 2006 program, "What's in a Number"); Bethea Dep. at 102 (discussing release for 2007 interview).) Although not clear at the outset of this litigation, Plaintiffs do not challenge NFL Films' use of these interviews in its productions. Instead, they challenge only the use of the video footage of them playing football, whether for a single second or several seconds, in NFL Films productions.

*2 Plaintiffs' Second Amended Complaint claims that the NFL's use of game footage in which they appear violates the Lanham Act, 15 U.S.C. § 1125, Minnesota's common-law right of publicity, California's statutory and common-law rights of publicity, and Texas's common-law right of publicity. (2d Am. Compl. (Docket No. 258), Counts 1–5.) They also purport to raise a claim for violation of publicity rights under the common-law or statutes of all 50 states (*id.* Count 8), and finally bring a claim for unjust enrichment against the NFL. (*Id.* Count 9.) [3]

As noted above, this case originated as a putative class action brought by 23 former professional football players on behalf of all similarly situated former players. Most of the original plaintiffs, however, resolved their differences with the NFL in a settlement that established a fund for the benefit of all former professional football players as well as a licensing agency to assist those players in exploiting their publicity rights. (Docket No. 431.) Dryer, Bethea, and White opted out of the settlement class and chose to pursue their individual claims. Thus, the only claims at issue in these Motions are the individual claims of Dryer, Bethea, and White.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The Court must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir.1996). However, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. 2548; *Enter. Bank,* 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Before the Court can turn to the merits of the parties' arguments, it must address a misconception evident in Plaintiffs' submissions. Throughout their briefing, Plaintiffs insist that Defendants' Motion impermissibly seeks to revisit this Court's legal analysis in the Order denying Defendants' Motion for Judgment on the Pleadings. (Docket No. 35.) But Plaintiffs overlook two important differences between the Court's previous analysis and that to be undertaken here.

In the prior Order, the Court was constrained by Plaintiffs' allegations and could only determine whether, based solely on those allegations, Plaintiffs had succeeded in stating a claim. Here, on the other hand, discovery is complete and now the Court must examine whether the record establishes any genuine issues of fact material to those claims. Thus, Plaintiffs are incorrect in arguing that the Court's preliminary determinations control here.

**\*3** In addition, there is another important difference between the case as it stands now and as it stood in January 2010. In 2010, this case was a class action involving the claims of thousands of former football players. Today, this case involves the claims of three former football players. The

analysis required to evaluate whether any of the thousands of original Plaintiffs could maintain their claims is much different from that required to determine whether these three individuals have established genuine issues of fact as to their claims.

### B. First Amendment

The NFL principally argues that the First Amendment protects its use of game footage in NFL Films productions and outweighs Plaintiffs' interests in their rights of publicity. Most cases involving the First Amendment pit a specific government regulation against the freedom of speech. *See, e.g., City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (challenging city's ban on commercial publications in newspaper boxes on city-owned property). This case does not involve a government regulation, but rather involves a judicially enforced right of publicity, vindicated between private parties. The free-speech issues here are considerably more nuanced than those present in the regulatory context. *Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509, 514 (7th Cir.2014). Indeed, "there is no judicial consensus on how to resolve conflicts between intellectual-property rights and free-speech rights." *Id.*

But despite the lack of consensus, the task in this case is to balance Plaintiffs' rights to profit from their own likenesses and the NFL's freedom of expression. *See Brown v. Elec. Arts, Inc.,* 724 F.3d 1235, 1241 (9th Cir.2013) (courts must find "the appropriate balance between [Plaintiffs' publicity rights], on the one hand, and First Amendment rights, on the other"); *see also C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.,* 505 F.3d 818, 823 (8th Cir.2007) ("The Supreme Court has directed that state law rights of publicity must be balanced against first amendment considerations."); *Gionfriddo v. Major League Baseball,* 94 Cal.App.4th 400, 409, 114 Cal.Rptr.2d 307 (Cal.Ct.App.2001) ("The First Amendment requires that the right to be protected from unauthorized publicity 'be balanced against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press.' " (quoting *Gill v. Hearst Publ'g Co.,* 40 Cal.2d 224, 228, 253 P.2d 441 (Cal.1953))).

Put another way, this Court must determine whether the protection due the NFL Films productions under the First Amendment is outweighed by Plaintiffs' interest in their own publicity rights. There are two different approaches to this

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

balancing test. First, some courts examine whether the work being challenged is commercial or non-commercial speech. *See, e.g., Jordan,* 743 F.3d at 515. Plaintiffs do not dispute that if the Court determines that the productions at issue are expressive, non-commercial works, their claims against those films fail. *See Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (content-based restrictions on non-commercial speech are appropriate "only in the most extraordinary circumstances").

 **\*4** The second approach is to examine the challenged use of the plaintiff's likeness or persona and determine whether that use supersedes the asserted right of publicity. *See, e.g., C.B.C.,* 505 F.3d at 823–24. Courts following this approach review the challenged use's value under the First Amendment but do not engage in the more detailed commercial-speech inquiry.

The parties have extensively argued and briefed whether the productions at issue are commercial speech, and the Court has previously undertaken a preliminary commercial-speech analysis. (*See* Jan. 28, 2010, Mem. & Order (Docket No. 35) at 9–13, 689 F.Supp.2d 1113, 1118–21 (D.Minn.2010).) Thus, the Court will begin by determining whether the challenged productions are commercial speech.

## 1. Commercial Speech

 **[1]** **[2]** To determine whether the speech at issue is commercial speech, a court must evaluate the "content, form, and context" of the speech "as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The ultimate question of whether speech is commercial is a question of law. *Id.* at 148 n. 7, 103 S.Ct. 1684. In the Order on the Motion for Judgment on the Pleadings, the Court determined that Plaintiffs had sufficiently and plausibly alleged that the programs at issue were commercial speech. (Jan. 28, 2010, Mem. & Order at 13, 689 F.Supp.2d at 1121.) The Court must revisit that determination here in light of the fully developed record.

The Court's previous discussion of the commercial-speech analysis noted that the Supreme Court has carefully avoided any precise definition of commercial speech. (*Id.* at 3.) But despite the Supreme Court's warnings about "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category," *City of Cincinnati,* 507 U.S. at 419, 113 S.Ct. 1505, most discussions of commercial speech in this Circuit use the three-part test set forth in *Porous Media Corp. v. Pall Corp.:* whether the speech is

an advertisement, whether it refers to a specific product, and the speaker's economic motivation for the speech. 173 F.3d 1109, 1120 (8th Cir.1999) (citing *Bolger,* 463 U.S. at 66, 103 S.Ct. 2875). None of these factors, standing alone, renders the speech at issue commercial, but the "combination of *all* these characteristics, however, provides strong support" for the conclusion that the speech is commercial. *Bolger,* 463 U.S. at 66, 103 S.Ct. 2875 (emphasis in original). The *Bolger* Court warned that it did not "mean to suggest that each of the characteristics ... must necessarily be present in order for speech to be commercial" and the Court "express[ed] no opinion as to whether reference to any particular product or service is a necessary element of commercial speech." *Id.* at 67 n. 14, 103 S.Ct. 2875.

Because the commercial-speech determination depends initially on the content of the challenged speech, the Court will first examine the productions Plaintiffs challenge.

### a. *The challenged films*

Plaintiffs challenge 155 separate NFL Films productions in which they appear. As noted above, Plaintiffs challenge the productions' use of game footage, that is, video footage of Plaintiffs playing in actual football games. The NFL has provided the Court with charts summarizing each challenged production along with the amount of time a Plaintiff appears in that production, including that Plaintiff's first appearance in the production, when possible, and an estimate of the total amount of time the Plaintiff appears on screen as a percentage of the total run time of the production. (Connolly Aff. Exs. A–C.) Plaintiffs do not dispute the information in these charts, apparently conceding that the NFL's characterization of the productions' content is correct.

 **\*5** Because of the large number of challenged productions involved, the Court will limit the following discussion to the productions that, after having reviewed all of the productions, the Court believes are most representative of the productions in which each Plaintiff appears. These representative productions are those in which footage including each Plaintiff makes up the highest percentage of total run time of the productions. By examining the productions featuring the most footage for a Plaintiff, the Court can determine whether the record bears out Plaintiff's claims about the productions.

WestLaw

### i. *Dryer*

Of the 47 NFL Films productions that show footage of Dryer playing football, the 24–minute production titled "Game of the Week 1969 Week # 1 Vikings vs. Giants" features the most footage of Dryer, in terms of the percentage of time Dryer appears on screen. Footage of plays including Dryer constitutes approximately 10% of the entire production. (Connolly Aff. Ex. A.)

This particular film tells the story of the first game in Dryer's rookie NFL season. Using game footage and dramatic narration and music, the production showcases pivotal plays in a game between the Minnesota Vikings, one of the NFL's most powerful teams at that time, and the New York Giants, who were welcoming a new coach after a poor showing in the 1968 season.

The production undeniably shows Dryer playing football on the Giants' defensive line, although his name is not mentioned until more than 5 minutes into the film and is spoken only twice in the entire production. The only way a viewer would know that Dryer appears in the footage is if the viewer knows that Dryer wore number 89 for the Giants. He is not featured in the production; as noted, his name is mentioned only in the context of his performance in two particular plays. Most of his appearances in the production are fleeting, for mere seconds or fractions of seconds at a time, and are accompanied by narration discussing other players involved in the featured play. The production never focuses only on Dryer or his image; rather, he is always shown with his teammates in the context of a football play.

### ii. *Bethea*

The program with the most footage from Bethea's playing career is "1973 Houston Oilers Season Highlight." As with the Dryer program discussed above, this production contains the most footage of Bethea, in terms of percentage of screen time, of any of the productions Bethea challenges. Yet Bethea's image is on screen for only approximately 10% of the 23–minute production. (Connolly Aff. Ex. B.)

The production first mentions Bethea by name nearly 9 minutes after the beginning of the production; again, unless the viewer knows that Bethea wore number 65 for the Oilers, his earlier appearances would be indistinguishable from those

of his teammates. Unsurprisingly, given Bethea's ultimate selection to the Pro Football Hall of Fame, the production highlights his play during the 1973 season. The segment featuring Bethea runs for approximately one minute of the production, with the narrator summing up Bethea's prowess on the football field: "Without any doubt, he is the best." But Bethea is not the only player to receive individual attention in the production; many of his teammates receive a similar one-minute treatment of their individual performances. After this minute-long segment, Bethea is not mentioned by name again in the production.

### iii. *White*

**\*6** Several of the productions in which footage of White playing football constitutes 10% or more of the running time of the production are short productions, two minutes or fewer in length. One such production is "NFL Superstar: Dan Fouts." As the name suggests, this one-minute-long production celebrates the career of White's Chargers teammate, quarterback Dan Fouts. White played on the offensive line in front of Fouts, and his number 67 is evident in many of the plays shown in this brief production. White is not mentioned by name, however, and unless the viewer knows that White wore 67 for the Chargers, the viewer would not know that White appears in the production at all.

As with Dryer and Bethea, footage of White playing football also appears in longer productions, such as the 23–minute production "Cliffhangers, Comebacks & Character: The 1981 San Diego Chargers." White's image appears on screen for approximately 10% of the total production. (Connolly Aff. Ex. C.) The narrator first mentions White more than 8 minutes into the production, and then only by last name and in conjunction with the names of his offensive-line teammates. White also appears in a 10–second interview clip, apparently filmed in the locker room after a game, in which he discusses the team's prospects. He is identified on the screen by name and position. His name is not mentioned again for the remaining 10 minutes of the film. And in comparison to the production's portrayal of Chargers players like Dan Fouts, Kellen Winslow, and others, its coverage of White is minimal.

### b. *Advertisement*

**[3]** The next step in the commercial-speech determination is an analysis of the *Porous Media* factors. The first of these

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

factors asks whether the speech involved is an advertisement. *Porous Media,* 173 F.3d at 1120. Plaintiffs claim that the NFL has admitted that NFL Films productions are advertising by equating those productions to a $350 million advertising budget in one powerpoint presentation and to an even larger advertising budget in another, more recent, presentation. (Gleason Aff. Ex. 4.) But the fact that NFL Films productions generate substantial goodwill for the NFL is not itself dispositive of the issue whether the productions themselves are advertising within the meaning of the *Porous Media* test.

 [4]   The NFL urges the Court to adopt a narrow definition of advertising, which is also the "core" definition of commercial speech: advertising is speech that proposes a commercial transaction. *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 482, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Although speech that does no more than propose a commercial transaction is by definition commercial speech, other speech may be deemed commercial even though it does not explicitly propose a commercial transaction. *See id.* at 475, 109 S.Ct. 3028 (Communications may "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues."); *see also Jordan,* 743 F.3d at 517 ("[I]t's a mistake to assume that the boundaries of the commercial-speech category are marked exclusively by this 'core' definition.").

 *7   Plaintiffs recognize that the productions at issue here are not the typical advertisement: the productions do not offer anything for sale or encourage viewers to buy something. Plaintiffs insist that the productions are nonetheless advertising because they are positive depictions of the NFL that serve to enhance the NFL's brand. *See Jordan,* 743 F.3d at 518 ("An advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service.").

On one level, Plaintiffs' brand-enhancement theory is an attractive one. But in the context of the productions at issue, Plaintiffs' theory breaks down. First, while it is true that brand enhancement may be an element of advertising, brand enhancement alone is not sufficient to render a production advertising as a matter of law, and Plaintiffs are mistaken to read the Seventh Circuit's recent *Jordan* decision as support for that proposition. When examined closely, it is clear that unlike the work at issue in *Jordan,* the productions at issue here are not advertising.

In *Jordan,* a grocery-store chain published a full-page ad in a sports magazine, congratulating NBA superstar Michael Jordan on his selection to the professional basketball hall of fame. 743 F.3d at 512. The ad did not feature any pictures of Jordan, but instead showed his signature basketball shoes with the number he wore while playing for the Chicago Bulls. *Id.* In the center of the page was the store's logo and slogan: "Good things are just around the corner." *Id.* This slogan was repeated in the text congratulating Jordan, stating that as "a fellow Chicagoan he was 'just around the corner' for many years." *Id.*

The Seventh Circuit held that this work was commercial speech, and in particular that it was an advertisement within the meaning of the first element of the three-part test. The court found that the ad was "a form of image advertising aimed at promoting goodwill for the [store's] brand by exploiting public affection for Jordan...." *Id.* at 519. In making this determination, the court found significant that the "ad is easily distinguishable from the magazine's editorial content.... It looks like, and is, an advertisement." *Id.*

In contrast to the print advertisement in *Jordan,* the productions here do not appear in other media as paid "spots." The productions cannot be distinguished from the other content; the productions are the content. This contrast matters. The NFL does not pay television networks to broadcast NFL Films productions. Rather, those networks pay the NFL for the right to air those productions. In addition, other advertisers pay to have their advertisements inserted into the production's broadcast. The productions themselves are not advertising.

Nor do the productions exploit players' images for the singular purpose of brand enhancement or other commercial gain. Instead, the productions tell the story of a football game, or a football team, or even of a particularly great football player. They are, in that sense, a history lesson of NFL football. The only way for NFL Films to tell such stories is by showing footage of the game—the plays, the players, the coaches, the referees, and even the fans. The NFL is capitalizing not on the likenesses of individual players but on the drama of the game itself, something that the NFL is certainly entitled to do. Plaintiffs do not explain how the NFL could create a visual recounting of a significant football game or the season of a particular football team without the use of footage of NFL players playing in those games. While the NFL certainly reaps monetary benefits from the sale and broadcast of these productions, the use of any individual player's likeness —the productions' display of footage of plays involving

an individual player—is not for commercial advantage but because the game cannot be described visually any other way. Plaintiffs have not established that the productions at issue are advertisements within the meaning of the *Porous Media* test.

### c. *Reference to a Product or Service*

**\*8** For their theory that the productions reference the NFL as a product, Plaintiffs rely on the Third Circuit's opinion in *Facenda v. NFL Films, Inc.,* 542 F.3d 1007 (3d Cir.2008). In *Facenda,* the estate of the long-time voice of NFL Films challenged the use of his distinctive voice in a film documenting the creation of a football video game. 542 F.3d at 1012. The Third Circuit compared the film at issue to an infomercial: it referenced one product, it featured a clock counting down the days until the product's release, and it was broadcast only in the few days immediately before the product's release, "much like an advertisement for an upcoming film." *Id.* at 1017. Indeed, the film existed only "to promote another creative work, the video game." *Id.* at 1018. Thus, that court did not hesitate to find that the film was commercial speech.

Here, the productions do not promote a product separate from the productions themselves. The productions exist in their own right—they are the stories of the NFL. As discussed previously, there is no other way for the NFL to tell the story of its games and its players without the use of game footage, use which necessarily includes the images of NFL players. Plaintiffs have failed to raise a genuine issue of fact as to whether the productions reference a product or service.

### d. *Economic Motivation*

**[5]** In its previous Order, the Court found that "there is no serious dispute that the NFL has an economic motivation for the films at issue." (Jan. 28, 2010, Mem. & Order at 10, 689 F.Supp.2d at 1119.) That portion of the commercial-speech analysis has not changed. It is, however, not dispositive of the commercial-speech analysis because having determined that the first two elements of the *Porous Media* test are not met, the NFL's economic motivation for producing NFL Films productions cannot by itself suffice to establish that the productions are commercial speech. This proposition is self-evident: that movies, books, or other expressive works "are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by

the First Amendment." *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). This is not commercial speech; it is capitalism.

### e. *Conclusion*

The productions do not meet two of the three elements of the *Porous Media* test. They are therefore not commercial speech and are instead entitled to full protection under the First Amendment. Because the productions are fully protected speech, Plaintiffs' claims against them fail.

### 2. The Use of Plaintiffs' Likenesses in the Productions

**[6]** As noted, some courts balancing the First Amendment with the plaintiff's right of publicity focus on the challenged use of the plaintiff's likeness and do not address whether the underlying work is commercial speech. Three decisions in particular have addressed the First Amendment protection due to the use of professional athletes' names, likenesses, or even video clips of their athletic performances without a discussion of the *Porous Media* or *Bolger* factors: *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.,* 505 F.3d 818 (8th Cir.2007); *CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.,* 259 F.R.D. 398 (D.Minn.2009) (Montgomery, J.); and *Gionfriddo v. Major League Baseball,* 94 Cal.App.4th 400, 114 Cal.Rptr.2d 307 (2001). In all three cases, the courts found that the constitutional protection due the use at issue outweighed the publicity rights of the plaintiff professional athletes.

**\*9** Both *C.B.C.* and *CBS* involved the use of current professional athletes' names, images, and statistics for the purposes of online fantasy games. In *C.B.C.,* Major League Baseball and its players' union challenged another entity's use of baseball players' names and playing information such as statistics and biographical information in an online fantasy baseball website. *C.B.C., 505 F.3d at 822.* The court focused on the nature of the information used and the public value of that information, finding that even though the speech involved was entertainment, " '[s]peech that entertains, like speech that informs, is protected by the First Amendment.' " *Id.* at 823 (quoting *Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 969 (10th Cir.1996)). The court noted that the information on C.B.C.'s website was not only already in the public domain, but that the information also commanded substantial public interest. *Id.* at 823–24. Although the *C.B.C.* court found that the players

WESTLAW © 2014 Thomson Reuters. No claim to original U.S. Government Works.

11

had succeeded in making out a claim for a violation of their publicity rights under Missouri law, *id.* at 823, the court determined that C.B.C's "first amendment rights in offering its fantasy baseball products supersede the players' rights of publicity." *Id.* at 824.

Similarly, professional football players challenged the use of their names, images, and playing and biographical information in CBS Sports' online fantasy football games. *CBS,* 259 F.R.D. at 403–04. CBS sought a declaratory judgment that the First Amendment superseded the players' rights of publicity. *Id.* at 414. Judge Ann D. Montgomery of this District noted that the *C.B.C.* decision focused on the use of player information in determining that such use fell within the ambit of the First Amendment. *Id.* at 417. She then determined that the use of player information in CBS's fantasy games was no different from that in *C.B.C.* and deserved similar First Amendment protection. *Id.* at 417–18.

In *CBS,* the players argued that the purpose of CBS's use of player information was to market its online games and drive traffic to its website. *Id.* at 418. This is similar to Plaintiffs' argument here that NFL Films productions serve to promote the NFL and enhance the NFL's brand and, as such, are commercial speech that should receive limited constitutional protection. But, as Judge Montgomery determined, the mere fact that the use is "for purposes of profit" does not necessarily reduce the First Amendment protection due that use. *Id.* What matters is the nature of the use, not merely the profit motives of the user.

*Gionfriddo* involved not only names, images, and biographical information, but also video clips of former players playing baseball, all featured on Major League Baseball's website. The *Gionfriddo* court confronted uses of baseball players' likenesses that is not unlike the uses Plaintiffs challenge here: *Gionfriddo,* a former baseball player, brought publicity-rights claims against Major League Baseball's use of photographs, video clips of baseball games, and player names and statistics on its website. The *Gionfriddo* court determined that information at issue—"factual data concerning the players, their performance statistics, and verbal descriptions and video depictions of their play"— was information about the history of the game of baseball that was the subject of great public interest. *Gionfriddo,* 114 Cal.Rptr.2d at 314. The court therefore decreed that the use was speech entitled to "substantial constitutional protection." *Id.* at 315.

**\*10** The court dismissed Gionfriddo's argument that the use was commercial and therefore not protected speech, noting that players' information was not being used to sell an unrelated product. *Id.* at 317. Had Major League Baseball chosen to use the plaintiff's likeness in an advertisement for the game of baseball, the court found that such use would be permissible. "The owner of a product is entitled to show that product to entice customers to buy it." *Id.* Only if Major League Baseball attempted to use former players' likenesses to sell an unrelated product would the players' publicity rights trump that use. *Id.*

In the previous Order, this Court declined to rely on *C.B.C.,* *CBS,* or *Gionfriddo* to determine as a matter of law that the NFL Films productions were protected speech under the First Amendment. (*See* Jan. 28, 2010, Mem. & Order at 8–9, 689 F.Supp.2d at 1118 (noting that the commercial-speech inquiry depends on the context, form, and content of the speech "as revealed by the whole record" and thus required further factual development) (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684).) The Court specifically noted that the information and images at issue in *C.B.C.,* *CBS,* and *Gionfriddo* were all in the public domain, unlike the video footage of NFL games, which the NFL protects vigorously. (*Id.*) But Plaintiffs have had their chance to develop the record in this case and have failed to establish that the uses of which they complain are truly different from the uses found permissible in *C.B.C., CBS, and Gionfriddo.* In particular, Plaintiffs have not explained how the NFL's protection of its copyright in game footage means that its use of that footage in NFL Films productions is entitled to no constitutional protection. And a review of the challenged productions makes clear that the challenged uses of Plaintiffs' likenesses in game footage are akin to the use of game footage in sports news broadcasts, newspapers, and magazines, "which routinely display pictures and information about ... professional athletes." *CBS,* 259 F.R.D. at 419. The films show footage of football games as football games, much like a news report would. The uses here, like the uses in *C.B.C., CBS,* and *Gionfriddo,* are protected speech under the First Amendment.

Balancing the challenged uses against the rights the players sought to vindicate, the *C.B.C.* court found that the use of the players' likenesses and information "barely, if at all, implicate[d] the players' publicity rights. *C.B.C.,* 505 F.3d at 824. Similarly, the *Gionfriddo* court found the plaintiffs' economic interests "negligible" and far outweighed by "the public interest favoring the free dissemination of information

regarding baseball's history." *Gionfriddo,* 114 Cal.Rptr.2d at 318. State publicity rights are intended "to provide incentives to encourage a person's productive activities and to protect consumers from misleading advertising." *C.B.C.,* 505 F.3d at 824. But here, as in *C.B.C.,* the players were paid for their participation in NFL football games. *Id.* And Plaintiffs played football; there is no danger that consumers will falsely believe that Plaintiffs were engaged in an activity other than playing football. An evaluation of the full record shows that the balance between Plaintiffs' publicity rights and the constitutional protection due the uses involved here tips decidedly in favor of the NFL.

## C. Publicity Rights

 **\*11** Even if the productions are deemed commercial speech and are therefore due limited First Amendment protection, Plaintiffs have not pointed to genuine issues of fact in the record to establish their publicity-rights claims.

The right to publicity is created by state law, so the Court must determine which state's law to apply to each Plaintiff. Plaintiffs ask the Court to apply New Jersey law to all three Plaintiffs, despite that they did not raise a specific claim under New Jersey law in the Second Amended Complaint. In the alternative, the parties do not dispute that White's publicity-rights claims arise under Minnesota or California law, or that Bethea's claims arise under Texas law. The parties do dispute whether California or New York law applies to Dryer's claims. [4]

### 1. New Jersey law

 **[7]** Plaintiffs argue that choice-of-law principles mandate that the Court apply New Jersey law to all Plaintiffs' publicity-rights claims. To support their argument, Plaintiffs rely only on the fact that NFL Films is headquartered in New Jersey and the productions at issue are stored in New Jersey. But Plaintiffs cite no authority for their assertion that NFL Films' place of business is dispositive of the choice-of-law analysis. Plaintiffs merely offer cursory treatment of the choice-of-law factors that Minnesota law directs the Court to consider. *See Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408, 412 (1973) (outlining five choice-of-law factors: predictability of result, maintenance of interstate order, simplification of the judicial task, advancement of the forum's governmental interest, and the better rule of law). Plaintiffs also offer no evidence supporting their naked assertions that the various factors weigh in favor of New Jersey law. They contend that "all Plaintiffs had significant contacts with New Jersey" (Pls.'

Opp'n Mem. at 20), but do not specify those contacts. The only connection between this lawsuit and New Jersey that is apparent from the record is NFL Films' connection to New Jersey. [5] It may be that New Jersey has sufficient connections to Plaintiffs' claims to make the application of New Jersey law appropriate under the *Milkovich* factors. But Plaintiffs have not put forward any analysis or evidence to establish those factors. The Court will not construct arguments for the parties on this complex choice-of-law issue. (*See* Nov. 1, 2013, Mem. & Order (Docket No. 431) at 13 ("The choice-of-law analysis in this case is exceedingly complex.").) Plaintiffs have failed to establish that the application of New Jersey law is appropriate.

### 2. California law

 **[8]** As noted, California law applies to at least some of Dryer's and White's claims. Under California's common law, a claim for violation of publicity rights has four elements: "(1) the defendant's use of plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Eastwood v. Superior Ct. for Los Angeles Cnty.,* 149 Cal.App.3d 409, 198 Cal.Rptr. 342, 347 (1983). California's publicity-rights statute, California Civil Code § 3344(a), "complement[s]" the common law cause of action, providing the additional elements of knowing use and "a direct connection ... between the use and the commercial purpose." *Id.* at 346–47.

### 3. Texas law

 **\*12** **[9]** Texas law applies to Bethea's claims, as he played only in Texas and lives in Texas. Under Texas law, a plaintiff raising a claim for a violation of his publicity rights must establish "(1) the defendant misappropriated the plaintiff's name or likeness for the value associated with it and not in an incidental manner or for a newsworthy purpose; (2) the plaintiff can be identified from the publication; and (3) the defendant derived some advantage or benefit." *Brown v. Ames,* 201 F.3d 654, 657–58 (5th Cir.2000). There is no statutory right of publicity in Texas.

### 4. Minnesota law

 **[10]** Minnesota's tort of appropriation "is committed when one 'appropriates to his own use or benefit the name or likeness of another.' " *Lake v. Wal–Mart Stores, Inc.,* 582 N.W.2d 231, 233 (Minn.1998) (quoting Restatement (Second) of Torts, § 652C). Minnesota does not require the

WestLaw

13

use to have a commercial purpose, "and appropriation may occur even though the benefit sought is not a pecuniary one." *Wagner v. Gallup, Inc.,* 989 F.Supp.3d 782, 791 (D.Minn.2013) (Ericksen, J.). As in Texas, Minnesota recognizes only a common-law, not a statutory, right of publicity.

**5. New York law**

[11] The right of publicity under New York law derives solely from statute. *Hoepker v. Kruger,* 200 F.Supp.2d 340, 348 (S.D.N.Y.2002). New York Civil Rights Law § 51 requires a plaintiff to show "that the defendant made use, within the state of New York, of plaintiff's name, portrait or picture 'for advertising purposes or for the purposes of trade' without plaintiff's written consent." *Titan Sports, Inc. v. Comics World Corp.,* 870 F.2d 85, 87 (2d Cir.1989) (quoting N.Y. Civ. Rights Law § 51).

**6. Defenses to Publicity–Rights Claims**

The NFL contends that Plaintiffs' publicity-rights claims fail under all of the above states' laws for several reasons. [6]

**a. *Newsworthiness***

First, the NFL argues that each state recognizes an exception to the right of publicity for "newsworthy events or matters of public interest." *Stephano v. News Group Pub'ns, Inc.,* 64 N.Y.2d 174, 485 N.Y.S.2d 220, 474 N.E.2d 580, 584 (1984); *see also* Cal. Civ.Code § 3344(d) (exempting uses "in connection with any news, public affairs, or sports broadcast or account, or any political campaign"); *Brown v. Ames,* 201 F.3d 654, 657–58 (5th Cir.2000) (noting that an element of a publicity-rights claim under Texas law is whether the defendant's use of the plaintiff's likeness was not "for a newsworthy purpose"). According to the NFL, the challenged programs fall within that newsworthiness exception. Plaintiffs counter that newsworthiness is a fact-intensive inquiry inappropriate for resolution on a motion for summary judgment.

**i. *California law***

[12] [13] Under California law, "[l]iability will not lie for common law right-of-publicity claims for the 'publication of matters in the public interest.' " *In re NCAA Student–*

*Athlete Name & Likeness Licensing Litig.,* 724 F.3d 1268, 1282 (9th Cir.2013) (quoting *Montana v. San Jose Mercury News, Inc.,* 34 Cal.App.4th 790, 40 Cal.Rptr.2d 639, 640 (1995)). "Similarly, liability will not lie for [California's] statutory right-of-publicity claims for the 'use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account....' " *Id.* (quoting Cal. Civ.Code § 3344(d)). The newsworthiness determination is often made as a matter of law. *See, e.g., id.* at 1283 (determining that newsworthiness defenses were not applicable as a matter of law); *Montana,* 40 Cal.Rptr.2d at 643 (affirming summary judgment for newspaper on newsworthiness defense).

**\*13** [14] Both the statutory and common-law newsworthiness defenses "protect only the act of publishing or reporting." *In re NCAA Student–Athlete Litig.,* 724 F.3d at 1282. Here, Plaintiffs do not appear to dispute that the NFL Films productions meet this element of the defense. But even if Plaintiffs challenged whether the productions were publishing or reporting, it is clear that the productions at issue are "a means for obtaining information about real-world football games," and are therefore "publishing or reporting factual data" within the meaning of the California newsworthiness defenses. *Id.* at 1283. The productions show football players playing in football games. The productions' use of music, narration, and camera angles may dramatize those games, but the productions do not convey information other than true information about "real-world football games."

It is similarly clear that "the subject matter of the communication is of 'public interest' or related to 'news' or 'public affairs.' " *Id.* at 1282. "The recitation and discussion of factual data concerning the athletic performance of these plaintiffs commands a substantial public interest...." *Gionfriddo,* 114 Cal.Rptr.2d at 315. Indeed, "there is no dispute that both professional baseball and professional football ... are closely followed by a large segment of the public." *CBS,* 259 F.R.D. at 419. Because the productions are reporting on a matter of substantial public interest, California's newsworthiness defense bars Dryer's and White's California publicity-rights claims.

**ii. *Texas law***

[15] [16] [17] [18] Texas law similarly exempts from its publicity-rights claim any use for a "newsworthy purpose."

WestlawNext 14

*Brown,* 201 F.3d at 657–58. The "newsworthiness defense" under Texas law

> is broad and extends beyond subjects of political or public affairs to all matters of the kind customarily regarded as "news" and all matters giving information to the public for purposes of education, amusement or enlightenment, where the public may reasonably be expected to have a legitimate interest in what is published.

*Anonsen v. Donahue,* 857 S.W.2d 700, 703 (Tex.App.1993). The determination of what is newsworthy may be made as a matter of law. *Lowe v. Hearst Comm'cns, Inc.,* 487 F.3d 246, 250 (5th Cir.2007).

Plaintiffs argue that the newsworthiness defense under Texas law is "limited to that which may be legitimately necessary and proper for public information." *Kimbrough v. Coca–Cola/USA,* 521 S.W.2d 719, 721 (Tex.Civ.App.1975). But this limitation on the newsworthiness defense does not help Plaintiffs' case. The NFL Films' use of Plaintiffs' images is the only way for the NFL to visually inform the public about historical football games. Thus, that use is "legitimately necessary" to provide the public with a visual record of the NFL's past. Bethea's Texas publicity-rights claim is barred by the newsworthiness defense.

### iii. *Minnesota law*

 **\*14** **[19]** According to Plaintiffs, Minnesota does not recognize a newsworthiness defense to its common-law publicity-rights claim. (Pls.' Opp'n Mem. at 15–16 (citing *Uhlaender v. Henricksen,* 316 F.Supp. 1277 (D.Minn.1970)).) The NFL argues that Minnesota courts have applied a public-interest exception to privacy-related claims similar to the right of publicity. (Def.'s Supp. Mem. at 16 (citing *Danforth v. Star Tribune Holdings Corp.,* No. A10–128, 2010 WL 4286242, at *4–5 (Minn.Ct.App. Nov. 2, 2010)).) In addition, given the Minnesota Supreme Court's reliance on the Restatement in formulating the invasion-of-privacy claims under Minnesota law, the NFL contends that Minnesota is likely to apply the Restatement's rule that publicity-rights claims do not include "using a person's identity in news reporting, commentary, [or]

entertainment...." *Restatement (Third) of Unfair Competition* § 47.

The newsworthiness defense is akin to a First Amendment privilege and arises from the same roots as that privilege. *See, e.g., Anonsen,* 857 S.W.2d at 703 (discussing "first amendment privilege, sometimes referred to as the 'newsworthiness defense' "). The constitutional parameters of the newsworthiness defense add credence to the argument that Minnesota courts will apply it to publicity claims.

Nor is the *Uhlaender* decision on point or persuasive. Indeed, much of the *Uhlaender* court's discussion is directly contrary to the Eighth Circuit's more recent holding in the *C.B.C.* case. *Compare Uhlaender,* 316 F.Supp. at 1282–83 (concluding that public nature of information used was not relevant to the court's evaluation of an appropriation claim) *with C.B.C.,* 505 F.3d at 823 (finding that, because the information used was in the public domain, the use was protected under the First Amendment).

It is likely that Minnesota courts would apply a newsworthiness defense to a publicity-rights claim. As discussed above, the use of White's identity in the challenged NFL Films productions was a matter of public interest and was for the purpose of giving information to the public. White's Minnesota publicity-rights claims are barred by the newsworthiness defense.

### iv. *New York law*

 **[20]** **[21]** **[22]** **[23]** Finally, there is no dispute that New York limits its statutory privacy-rights claim to publications that do not concern newsworthy events or are not in the public interest. *Stephano v. News Group Publ'ns, Inc.,* 64 N.Y.2d 174, 485 N.Y.S.2d 220, 474 N.E.2d 580, 584–85 (1984). This newsworthiness exception is "both a matter of legislative intent and a reflection of constitutional values in the area of free speech and free press." *Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 703 (1993). The " 'newsworthiness exception' should be liberally applied." *Finger v. Omni Publ'ns Int'l, Ltd.,* 77 N.Y.2d 138, 564 N.Y.S.2d 1014, 566 N.E.2d 141, 144 (1990). "[J]udicial intervention should occur only in those instances where there is 'no real relationship' " between the plaintiff's image and the use of that image, "or where the [use] is an 'advertisement in disguise.' " *Id.* (quoting *Murray v. New York Mag. Co.,* 27 N.Y.2d 406, 318 N.Y.S.2d 474, 267 N.E.2d 256, 258 (1971)).

**\*15** As discussed above, Plaintiffs' play in the NFL was and continues to be the subject of public interest. There is a relationship between the footage of Plaintiffs playing football and the NFL Films productions because the NFL Films productions depict football games. And, despite Plaintiffs' insistence to the contrary, the productions are not advertisements in disguise. Dryer's publicity claims under New York law are barred by the newsworthiness exception.

### b. *Consent*

[24] [25] The NFL also argues that each Plaintiff explicitly or impliedly consented to the NFL's use of game footage.[7] Under California law, lack of consent is an element of a claim for violation of publicity rights. *Eastwood*, 198 Cal.Rptr. at 347. Texas courts apply the Restatement rule in publicity-rights cases, which is that "words or acts or silence and inaction" may constitute consent to the use. Restatement (Second) of Torts § 892 & cmt. c. Minnesota courts have not addressed whether consent is a defense to a claim for violation of publicity rights, but given the Minnesota Supreme Court's reliance on the Restatement, those courts are likely to do so. *See Lake*, 582 N.W.2d at 235. As the NFL recognizes, consent does not bar Plaintiffs' publicity-rights claims, but rather prevents them from recovering damages for any pre-suit act.

The record shows that all three Plaintiffs knew that NFL Films regularly captured game footage and used that game footage in subsequent productions. Each Plaintiff voluntarily and willingly appeared in those subsequent productions by giving interviews to NFL Films. Again, it is noteworthy Plaintiffs do not challenge NFL Films' use of those interviews, but only the use of game footage showing them playing football. But it is apparent that Plaintiffs consented to such use.

Plaintiffs argue that the NFL cannot rely on their post-retirement NFL Films' interviews to establish their consent, because "the interviews are not the subject of this suit." (Pls.' Opp'n Mem. at 43.) But whether NFL Films' use of Plaintiffs' interviews is separately actionable has no bearing on whether those interviews establish Plaintiffs' consent to NFL Films' use of game footage involving them.

Dryer testified that he "never thought [the NFL was] wrong" in showing game footage in NFL Films productions. (Dryer Dep. (Connolly Aff. Ex. F) at 123.) In discussing an interview

he gave to NFL Films in 2000, Dryer made clear that he believed that NFL Films had the right to show game footage, including images of him playing football: "It's their company." (*Id.*) White never considered whether the NFL could use game footage including his play in the 24 years between his retirement and the lawsuit, but he knew that the NFL was using that footage in NFL Films productions and did not object. (White Dep. (Connolly Aff. Ex. H) at 137.) And Bethea knew that the NFL Films productions included game footage, but he did not object to interview requests that would be combined with that game footage. (Bethea Dep. (Connolly Aff. Ex. G) at 96.) Indeed, Bethea "just was glad to be interviewed." (*Id.* at 95–96.)

**\*16** Through their own words and actions, Plaintiffs consented to, and even encouraged, NFL Films' use of game footage in which they appeared. The NFL has established its consent defense, and as to the claims raised under Minnesota, California, and Texas law, any damages Plaintiffs suffered up to the filing of this lawsuit are barred by their consent to the productions.

### D. Copyright

[26] If the First Amendment or the NFL's newsworthiness and consent defenses do not bar Plaintiffs' publicity-rights claims, section 301 of the Copyright Act, 17 U.S.C. § 301, preempts them. "The Copyright Act provides the exclusive source of protection for 'all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of the copyright as specified in [the Act].' " *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.,* 991 F.2d 426, 428 (8th Cir.1993) (quoting 17 U.S.C. § 301(a)). As a result, the Act preempts a state claim if: (1) the disputed work is within the subject matter of copyright; and (2) the state-law-created right is equivalent to any of the exclusive rights within the general scope of the Act. *Id.*

In its Order on the Motion for Judgment on the Pleadings, the Court held that Plaintiffs had plausibly alleged that the "work" at issue was Plaintiffs' identities. (Jan. 28, 2010, Mem. & Order at 14, 689 F.Supp.2d at 1121.) Thus, the Court determined that the Copyright Act did not preempt Plaintiffs' publicity-rights claims. The full record, however, has not borne out Plaintiffs' allegation in this regard. Rather, the "works" that Plaintiffs challenge are the NFL Films productions featuring game footage of them playing football.

Plaintiffs do not dispute that the NFL maintains a valid and enforceable copyright in the game footage NFL Films

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

gathers during each NFL football game. Instead, they contend that athletic events are not copyrightable and that their appearances in the athletic events are therefore not within the subject matter of copyright. But the works at issue here are not the football games themselves but rather NFL Films' video recordings of the football games. These recordings are copyrightable, as the legislative history of the Copyright Act makes abundantly clear. *See* H.R. No. 94–1476 at 52, reprinted in 1976 U.S.C.C.A.N. 5659, 5665 ("When a football game is being covered by four television cameras, with a director guiding the activities ... there is little doubt that what the cameramen and the director are doing constitutes 'authorship.' "). Plaintiffs' likenesses cannot "be detached from the copyrighted performances that were contained in the films." *Ray v. ESPN, Inc.,* No. 13–1179, 2014 WL 2766187, at *5 (W.D.Mo. Apr. 8, 2014). The "work" at issue is the NFL Films productions that are within the subject matter of copyright.

In its previous Order, this Court also concluded that the right of publicity was not equivalent to any of the exclusive rights in the Copyright Act. (Jan. 28, 2010, Mem. & Order at 14–15, 689 F.Supp.2d at 1121–22.) Intervening decisions have enlightened the issues involved here, causing the Court to revisit that preliminary determination.

**\*17** Two recent decisions in particular have grappled with issues similar to those involved in this matter, albeit in the context of professional wrestling, not professional football. *See Ray,* 2014 WL 2766187; *Somerson v. McMahon,* 956 F.Supp.2d 1345 (N.D.Ga.2012). In both of these cases, professional wrestlers challenged the rebroadcast of their wrestling performances, contending that such rebroadcast violated their state-law rights of publicity. *Ray,* 2014 WL 2766187, at *1; *Somerson,* 956 F.Supp.2d at 1348. And in reasoning that this Court finds persuasive, both courts determined that the Copyright Act preempted the plaintiffs' publicity-rights claims. *Ray,* 2014 WL 2766187, at *5; *Somerson,* 956 F.Supp.2d at 1356.

[27] " 'A performance that is 'fixed' (recorded under the permission of the performer) is copyrightable.... If that performer later objects to the reproduction or performance of that recording in an expressive, non-advertising use, then the claim is one of copyright infringement, not of infringement of the right of publicity.' " *Ray,* 2014 WL 2766187, at *5 (quoting J.T. McCarthy, *The Right of Publicity and Privacy* § 11.55 at 880–81 (2013 ed.).) In other words, a claim for a violation of the right to publicity against a copyrighted

work will lie only if that work is used for advertising, not in an expressive work. Thus, Plaintiffs' contention that the Copyright Act does not preempt their claims depends wholly on their assertion that the NFL Films productions at issue are advertising, because only "when defendant[ ] use[s] a work 'for the purposes of trade' 'such as in an advertisement' " are publicity claims not preempted by copyright. *Ray,* 2014 WL 2766187, at *5 (quoting *Facenda,* 542 F.3d at 1029). But for the reasons discussed at length above, the productions are not advertising and thus Plaintiffs' publicity-rights claims against those productions are preempted.

Plaintiffs do not claim here that NFL Films recorded the games in which they played without their permission, and indeed Plaintiffs' depositions reveal that they knew about and found benefit in NFL Films' game recordings. (*See* Section C.6.b., *supra.*) Nor do Plaintiffs argue that the NFL could not exploit the original game broadcast by showing that full broadcast on the NFL Network or ESPN Classic, for example. Rather, Plaintiffs' argument is that, by including clips of game footage in a new work, the NFL has violated Plaintiffs' right of publicity. Each Plaintiff's claims "are based on [NFL Films] reproducing the video recordings depicting him, preparing derivative works based on the video recordings of him, and distributing copies of these video recordings to the public." *Somerson,* 956 F.Supp.2d at 1355. But, as the *Somerson* court held, all of these uses "are encompassed by copyright law" and are therefore preempted. *Id.; see also Fleet v. CBS, Inc.,* 50 Cal.App.4th 1911, 1920, 58 Cal.Rptr.2d 645 (1996) ("A claim asserted to prevent nothing more than the reproduction, performance, distribution, or display of a [ ] performance captured on film is subsumed by copyright law and preempted."). Plaintiffs' performances on the football field are "part of the copyrighted material, and [their] likeness[es] [can]not be detached from the copyrighted performances that were contained in the films." *Ray,* 2014 WL 2766187, at *5. Thus, the NFL has the right to exploit that copyrighted game footage in expressive works such as the NFL Films productions at issue here. The NFL's valid copyright in the game footage forecloses Plaintiffs' publicity claims.

### E. Lanham Act

**\*18** [28] [29] Plaintiffs raise a claim for false endorsement under section 43(a) of the Lanham Act. That section prohibits the

> use[ ] in commerce [of] any word, term, name, symbol, or device, or

any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

15 U.S.C. § 1125(a)(1)(A). The Lanham Act applies only if the speech involved is commercial speech within the meaning of the Supreme Court's First Amendment jurisprudence. *Porous Media,* 173 F.3d at 1120.[8]

Plaintiffs' Lanham Act claims fail as a matter of law because, as previously determined, the NFL's use of their images is not commercial speech. But even if the challenged productions are commercial speech, Plaintiffs cannot show that those productions' uses of their likenesses was in any way false or misleading. The productions show Plaintiffs playing football. They do not graft Plaintiffs' likenesses onto hockey players and show Plaintiffs playing hockey, or some other sport, or performing some other activity unrelated to football. The productions show Plaintiffs engaged in their former profession: playing football. This use of game footage as game footage cannot, as a matter of law, cause confusion or mistake or deceive anyone as to Plaintiffs' affiliation with the NFL. Plaintiffs were affiliated with the NFL, their uniforms bore NFL trademarks, and they performed in copyrighted and widely distributed broadcasts of NFL games.[9] Under the circumstances of this case, a Lanham Act claim simply does not lie.

The NFL also raises the defenses of laches, estoppel, and acquiescence as to Plaintiffs' Lanham Act claims. Plaintiffs respond that these defenses depend heavily on the facts of the case and thus are not appropriate for resolution on a motion for summary judgment. Plaintiffs also argue that the NFL's conduct precludes it from asserting equitable defenses.

[30] [31] [32] "Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 602 (8th Cir.1999). Although in many

cases the applicability of laches is a factual issue, here the relevant facts are undisputed. Nearly all of the productions Plaintiffs challenge were made many years, if not decades, before Plaintiffs filed this lawsuit. "A delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial." *Wanlass v. Gen. Elec. Co.,* 148 F.3d 1334, 1337 (Fed.Cir.1998). The plaintiff must rebut that presumption by producing evidence either that the delay was reasonable or excusable or that the defendant suffered no prejudice. *Id.*

*19 Plaintiffs have failed to produce any evidence excusing their delay. They claim only that, until approached by counsel, they did not understand that they might have a claim against the NFL Films productions featuring them. This "ignorance of the law" excuse has no more success here than in a criminal matter. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 559 U.S. 573, 581, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.' ") (quoting *Barlow v. United States,* 7 Pet. 404, 411, 8 L.Ed. 728 (1833)). And although Plaintiffs claim that the NFL cannot show any prejudice from the delay, at this stage of the litigation and in light of the length of delay, it is not the NFL's burden to do so.[10] Rather, as noted above, the presumption Plaintiffs' delay created can be overcome only if Plaintiffs produce evidence that the NFL was not prejudiced. Plaintiffs have produced no such evidence here.

Nor have Plaintiffs succeeded in establishing that the NFL is not entitled to assert equitable defenses. Plaintiffs contend that the NFL knew that it was infringing on Plaintiffs' publicity rights but continued to do so, and that this intentional conduct means that the NFL cannot invoke equitable defenses. (Pls.' Opp'n Mem. at 39.) But as discussed above, NFL Films productions did not violate Plaintiffs' rights of publicity, and the NFL was merely exploiting its valid copyrights when it used copyrighted game footage to accurately portray a football game or games. Moreover, the NFL correctly cautioned others that the use of game footage for other purposes might impinge players' publicity rights because commercial use of player identities is not within either the NFL's copyright or the First Amendment. The NFL's conduct does not prevent it from asserting equitable defenses in this case.

In light of the protracted delay in bringing their claims, the doctrine of laches bars Plaintiffs' Lanham Act claims. Having

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

determined that the NFL has established that laches applies, the Court need not address the NFL's remaining equitable defenses.

### F. Unjust Enrichment

Because all of Plaintiffs' substantive claims fail, they have no claim for unjust enrichment.

### G. Appeal of Judge Boylan's Order

Finally, Plaintiffs have appealed the September 13, 2014, Order of Special Master Arthur J. Boylan, which granted in part and denied in part Plaintiffs' motion to compel certain discovery. (Docket No. 559.) In light of the Court's dismissal of Plaintiffs' claims, this appeal is moot.

### CONCLUSION

The NFL is entitled to use footage from NFL games to create expressive works telling the story of the NFL. Plaintiffs have failed to raise any genuine issues of fact as to any of their claims, and those claims must therefore be dismissed. Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Partial Summary Judgment (Docket No. 538) is **DENIED;**

   **\*20** 2. Defendant's Motion for Summary Judgment (Docket No. 542) is **GRANTED;**

3. Plaintiffs' Appeal (Docket No. 566) is **DENIED as moot;** and

4. The Second Amended Complaint (Docket No. 258) is **DISMISSED with prejudice.**

### LET JUDGMENT BE ENTERED ACCORDINGLY.

[1] The Rams moved to St. Louis in 1995.

[2] The Oilers moved to Tennessee in 1997 and became the Tennessee Titans in 1999.

[3] Counts 6 and 7 of the Second Amended Complaint raise right-of-publicity claims under Pennsylvania's statutes and common law. Because none of the three remaining Plaintiffs played in or hails from Pennsylvania, however, these claims are moot.

[4] Plaintiffs oppose the application of New York law to any of Dryer's claims likely because New York's statute of limitations for publicity-rights claims is one year from the first showing of the challenged programs. *See* N.Y. Civ. Practice L. & Rules § 215 (McKinney 2006); *Costanza v. Seinfeld,* 279 A.D.2d 255, 719 N.Y.S.2d 29, 31 (2001). According to the NFL, only one of the 12 programs that show Dryer playing football for the Giants was initially broadcast or disseminated within that limitations period.

[5] Although Dryer's former team, the New York Giants, now plays in New Jersey's Meadowlands Sports Complex, during Dryer's playing days the team played in Yankee Stadium in New York City. New York Giants, http:// en.wikipedia.org/wiki/New_York_Giants (last visited October 8, 2014).

[6] One of the defenses the NFL raises is the equitable defense of laches. This defense will be discussed in detail below in conjunction with Plaintiffs' Lanham Act claim.

[7] The NFL's consent defense does not apply to Dryer's claims under New York law because the New York publicity-rights statute requires that any consent be in writing.

[8] Because *Porous Media* made clear that the Lanham Act applies only to commercial speech, the Court does not agree with the NFL that the Eighth Circuit is likely to adopt the holding in *Rogers v. Grimaldi,* 875 F.2d 994, 999–1000 (2d Cir.1989), which applied the Lanham Act to expressive works.

[9] In fact, one NFL Films production, "NFL Films Presents 2006: Number 89," includes an image of Dryer wearing his Giants jersey that was obviously filmed at the time of the production. If Dryer was truly concerned about creating an impression that he endorses the NFL, he would not have agreed to be filmed wearing NFL trademarks in 2006, a mere three years before the filing of this lawsuit.

[10] Although it is not the NFL's burden to establish prejudice, the NFL has nonetheless done so in this case. Bethea's deposition alone illustrates the harm the long delay caused to witnesses' memories. Bethea testified that he could not remember details of an interview he gave to NFL Films in 2007. (Bethea Dep. (Connolly Aff. Ex. G) at 92.) That memories of events stretching back to the late 1960s would similarly be affected seems self-evident.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.