# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JAVON MARSHALL, STEVEN CLARKE,  )
CHRIS CONNER, PATRICK MILLER,  )
BYRON MOORE, CHAZ MOORE,   )
SEAN PARKER, ERIC SAMUELS,   )
MARLON WALLS, and ROD WILKS,  )
individually and on behalf of all others  )
similarly situated,         )
               )
   Plaintiffs,       )
               )
   v.           )  **No. 3:14-01945**
               )  **Judge Sharp**
ESPN INC.; CBS BROADCASTING, INC., )
NATIONAL BROADCASTING COMPANY )
INC.; ABC, INC.; FOX, INC.; IMG COLLEGE, )
LLC; ATLANTIC COAST CONFERENCE; )
BIG TEN CONFERENCE; BIG 12   )
CONFERENCE; PACIFIC-12 CONFERENCE; )
SOUTHEASTERN CONFERENCE;   )
CONFERENCE USA; OHIO VALLEY  )
CONFERENCE; BIG EAST CONFERENCE; )
IMG WORLDWIDE, INC.; IMG COLLEGE, )
LLC; BIG TEN NETWORK SERVICES, LLC; )
CBS COLLEGIATE SPORTS PROPERTIES, )
INC.; JMI SPORTS LLC; TELESOUTH  )
COMMUNICATIONS, INC., T3 MEDIA,  )
INC.; ESPN INC. D/B/A SEC NETWORK; )
SOUTHEASTERN CONFERENCE D/B/A SEC )
NETWORK; ESPN INC. D/B/A LONGHORN )
NETWORK; IMG COLLEGE, LLC D/B/A )
LONGHORN NETWORK; LEARFIELD  )
SPORTS LLC; and WILLIAM MORRIS )
ENDEAVORS, LLC,      )
               )
   Defendants.     )

1

## **MEMORANDUM**

This is a putative class action brought by current and former Student Athletes who played National Collegiate Athletic Association ("NCAA") football (at the Football Bowl Subdivision "FBS" level) or Division I college basketball. Named as Defendants are a host of conferences, networks, and licensors who allegedly profited from the broadcast and use of those Student Athletes' names, likenesses and images without permission. Pending before the Court are Motions to Dismiss (Docket Nos. 214, 218 & 226) filed on behalf of all Defendants. The Court heard oral arguments on those Motions on April 13, 2015, and, for the reasons that follow, will grant the Motions.

## **I. Background**

Plaintiffs are eight former college football players (three each from Vanderbilt University and the University of Tennessee, and one each from the University of Washington and the University of Tennessee, Chattanooga) and two former college basketball players (one each from Tennessee State University and the University of Maryland Eastern Shore).

Defendants are more than two dozen separate entities that fall into three camps. The assorted athletic conferences, specifically the Atlantic Coast Conference, Big East Conference, Inc., Big 12 Conference, The Big Ten Conference, Inc., Conference USA, Ohio Valley Conference, Pac-12 Conference, and Southeastern Conference (collectively, the "Conference Defendants"), manage athletic competition among teams and sell the rights to broadcast conference games. The networks, specifically, ESPN Inc., CBS Broadcasting Inc., NBCUniversal Media, LLC, ABC, Inc., Fox Broadcasting Company, Big Ten Network, LLC, SEC Network, and Longhorn Network (the

2

"Network Defendants")[1], purchase media content, including college sports from content owners, or produce it internally, and then telecast that content to television viewers. The licensing agencies, specifically, Outfront Media Sports, Inc. (f/k/a CBS Collegiate Sports Properties, Inc.), IMG Worldwide, LLC, IMG College, LLC, William Morris Endeavor Entertainment, LLC, JMI Sports LLC, Learfield Sports LLC, T3 Media, Inc., and TeleSouth Communications, Inc. (collectively, the "Licensing Defendants"), offer brand development and management and act as a conduit in licensing college teams' intellectual property.

Plaintiffs have filed a 194-paragraph, 39-page Complaint, the essence of which is that they "and other similarly situated current and former FBS football and NCAA Division I basketball Student Athletes . . . have been foreclosed from the market for the licensing, use, and sale of their names, images, and likenesses[.]" (Docket No. 1, Complaint ¶ 4).  The Complaint alleges:

> 5.  Defendants' collective action of excluding Student Athletes from the marketplace of their own names, images, and likenesses has caused the unlawful result of fixing the amount that current and former Student Athletes are paid for the licensing and sale of their names, images, and likeness at zero or, at most, their "cost of attendance."[2]
>
> 6.  Defendants' use of Student Athletes' names, images, and likenesses is unauthorized  because Student Athletes have not legally assigned their publicity rights to Defendants, the NCAA, or third parties acting on behalf of the NCAA.
>
> \*                           \*                           \*
>
> 8.  Broadcast Defendants have conspired to fix the amount Student Athletes are paid for the licensing, use, and sale of their names, images, and likenesses at zero or, at most, a portion of the cost of attendance, by colluding with the NCAA and Conference Defendants.  Broadcast Defendants, to their own commercial advantage,

---

[1]   The Network Defendants are collectively referred to in the Complaint as the "Broadcast Defendants."

[2]   "Cost of attendance" is defined in the Complaint as the total cost of attending college, including tuition, fees, room, board, books and supplies, transportation, and miscellaneous expenses.

3

refuse to negotiate or enter into contracts with Student Athletes. In so doing, Broadcast Defendants have adopted and implemented the restrictive bylaws and rules of the NCAA and Conference Defendants.

9. Licensing Defendants have conspired to fix the amount Student Athletes are paid for the licensing, use, and sale of their names, images, and likenesses at zero or, at most, a portion of the cost of attendance, by colluding with the NCAA and Conference Defendants. Licensing Defendants refuse to negotiate or enter into contracts with Student Athletes. In so doing, Licensing Defendants have adopted and implemented the restrictive rules and bylaws of the NCAA and Conference Defendants.

10. The conspiracy between and among the Broadcast Defendants, Licensing Defendants, Conference Defendants and the NCAA has created a marketplace resembling a plantation type arrangement where Defendants financially benefit in the collective amount of billions of dollars, while Student Athletes, the driving force of college sports, receive nothing more than their cost of attendance. This conspiracy has created an anticompetitive marketplace in which all Defendants commercially exploit the substantial value of each Student Athletes' images.

(Id. ¶¶ 5-6 & 8-10, internal parenthetical omitted).

Though the NCAA is alleged to be a part of the conspiracy, it not named as a Defendant in this action. Nevertheless, Plaintiffs' tacitly concede that any discussion of the alleged unlawfulness must acknowledge it existence and the role it plays in college sports.

According to the Complaint, the NCAA was founded in 1906[3] and "is an unincorporated association consisting of more than 1,200 colleges, universities, and athletic conferences" in the United States and "serves as the governing body of its member schools and athletic conferences." (Id. ¶ 76). The fundamental purpose of the NCAA is to:

maintain intercollegiate athletics as an integral part of the education program and the athlete as an integral part of the educational program and the athlete as a part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

---

[3] Originally, the NCAA was known as the Athletic Association of the United States.

4

(Id. ¶ 97).

In accordance with NCAA rules, intercollegiate sports are limited to participation of "amateur" athletes:

> Student-athletes shall be amateurs in intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student-athletes should be protected from commercial exploitation by professional and commercial enterprises.

(Id. ¶ 95). A Student Athlete may lose his or her amateur status if he or she:

> a. Uses his or her athletics skill (directly or indirectly) for pay in any form in that sport;
>
> b. Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;
>
> c. Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received;
>
> d. Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;
>
> e. Competes on any professional athletics team [under the governing Bylaw], even if no pay or remuneration for expenses was received, except as permitted [by the governing Bylaw];
>
> f. After initial full-time collegiate enrollment, enters into a professional draft; or
>
> g. Enters into an agreement with an agent.

(Id. ¶ 99).

In order to participate in NCAA sports, Student Athletes are required to sign a "Form 08-3a," that "allows the NCAA to use the Student Athlete's name or picture to 'generally promote' NCAA championships or other NCAA events, activities or programs." (Id. ¶ 132). Plaintiffs allege that "Student Athletes desiring to extend their athletic careers beyond high school are left with no

5

comparable alternative to accepting a scholarship from an FBS football or Division I basketball school," because "[b]oth the National Football League ('NFL') and the National Basketball Association ('NBA') prohibit high school players from entering their leagues directly after high school." (Id. ¶ 137).[4]  As a consequence, in order to play at a competitive level, Student Athletes have little or no choice but to accept a scholarship[5] and sign Form 08–3a, making the Form "a contract of adhesion and unenforceable." (Id. ¶ 139).

Plaintiffs claim that the NCAA and Defendants have "multi-billion dollar agreements," yet "the Student Athlete, receives nothing or, at most, the cost of attendance." (Id. ¶ 114).  The restrictive NCAA and Conference rule which "even go as far as to place quotas on the number of meals a Student Athlete may eat," allegedly "have deprived Student Athletes from realizing the commercial value of their images." (Id. ¶ 115).  That is, while the NCAA "purports to protect Student Athletes from commercial exploitation, [it] has conspired with Defendants to create an anticompetitive market where Student Athletes are powerless to realize the commercial value of their names, images and likenesses." (Id. ¶ 128).

Plaintiffs contend that the NCAA and Defendants have benefitted enormously from the status quo, all to the detriment of Student Athletes.  Just by way of examples, Plaintiffs claim:

  ‣ A basketball scholarship at the University of Kentucky is worth approximately $12,000 per year, yet the basketball team consisting of no more than 13 scholarship players, generated approximately $23 million dollars in revenue in 2012.

---

[4] "To be eligible for the NFL draft, a player must be at least 3 years removed from high school. To be eligible for the NBA draft, a player must be at least 1 year removed from high school." (Id.).

[5] Even with a scholarship, Plaintiffs assert that "college athletes can be left to pay sports-related medical bills," may be required "to pay thousands of dollars in out-of- pocket educational related expenses," and can lose the scholarship for any reason. (Id. ¶ 116).  They also assert that "[t]he room and board provisions in full scholarship leave 85% of players living on campus and 86% of players living off campus living below the federal poverty line." (Id. ¶ 118).

6

▸ Approximately 50% of NCAA football and men's basketball players are left without a college degree.

▸ According to a study, the average FBS football student athlete has a fair market value of $456,612 "above and beyond" the value of their scholarship, and the average men's basketball player has a fair market value of $1.06 million over four years, not including his scholarship.

(Id. ¶¶ 115, 127-128).

Plaintiffs' Complaint contains Seven Causes of Action. The first two Causes, against all Defendants, allege a statutory violation of the right of publicity under Tenn. Code Ann. § 47-25-1105 (First Cause) and a violation of the right to publicity under Tennessee common law (Second Cause); the Third Cause, also against all Defendants, alleges a civil conspiracy; the Fourth Cause, again against all Defendants, alleges a violation of Section 1 of the Sherman Antitrust Act; the Fifth Cause, against only the Licensing and Network Defendants, alleges false endorsement in violation of Section 43(a) the Lanham Act; and the Sixth Cause, against all Defendants, alleges unjust enrichment; and the Seventh Cause seeks an accounting as to all Defendants.

## II.  Application of Law

Defendants' Motions to Dismiss seek dismissal of all of Plaintiffs' claims.[6] The standards governing such Motions are well known, and it suffices simply to note that this Court's review is governed primarily by Rule 12(b)(6) of the Federal Rules of Civil Procedure, and the Supreme Court's application of that Rule in Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009), and Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955 (2007).

## A.  Right of Publicity – First And Second Causes of Action

---

[6] Many of the arguments overlap. For ease of reference, the Court will at times simply refer to the arguments collectively, as if raised by all of the Defendants.

7

"The right of publicity is, somewhat paradoxically, an outgrowth of the right of privacy."

ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 928 (6th Cir. 2003). It has been formally acknowledged to be a part of Tennessee's common law:

> "[T]he recognition of individual property rights is deeply embedded in our jurisprudence. These rights are recognized in Article I, Section 8 of the Tennessee Constitution and have been called "absolute" by the Tennessee Supreme Court. . . . In its broadest sense, property includes all rights that have value. It embodies all the interests a person has in land and chattels that are capable of being possessed and controlled to the exclusion of others. Chattels include intangible personal property such as choses in action or other enforceable rights of possession. . . . Tennessee's common law thus embodies an expansive view of property. Unquestionably, a celebrity's right of publicity has value. It can be possessed and used. It can be assigned, and it can be the subject of a contract.

State ex rel Elvis Presley v. Crowell, 733 S.W.2d 89, 96-97 (Tenn. Ct. App. 1987). That is, Tennessee's common law acknowledges a "property right in the use of one's name, photograph or likeness." Polygram Records, Inc. v. Legacy Ent. Grp., LLC, 205 S.W.3d 439, 445 (Tenn. Ct. App. 2006).

In addition to the right of publicity under the common law, Tennessee provides statutory protection to that right. "The Tennessee Legislature codified the right of publicity in 1984 when it enacted the Tennessee Personal Rights Protection Act ('TPRPA')." Gauck v. Karamian, 805 F. Supp.2d 495, 500 (W.D. Tenn. 2011). The TPRPA "was intended to 'create an inheritable property right for those people who use their names or likenesses in a commercial manner, such as an entertainer or sports figure – someone who uses his or her name for endorsement purposes.'" Wells v. Chattanooga Bakery, Inc., 448 S.W.3d 381, 390 (Tenn. Ct. App. 2014) (quoting Apple Corps Ltd. v. A.D.P.R., Inc., 843 F. Supp. 342, 348 (M.D. Tenn. 1993)).

Defendants argue that the TPRPA supplants whatever right to publicity that may exist under the common law. For two reasons, this Court agrees.

8

First, at least two courts in Tennessee have indicated that the statutory and common law rights to publicity are "co-extensive." Judge Trauger so stated in <u>Moore v. Weinstein Co., LLC</u>, 2012 WL 1884758, at *30 (M.D. Tenn. May 23, 2012), as did Judge McCalla in <u>Gauck</u>, 805 F. Supp.2d at 500 n.5. While Plaintiffs point out that "[n]either <u>Gauck</u> nor <u>Moore</u> defines the term 'coextensive,'" (Docket No. 257 at 5), "'[c]oextensive' means 'extending over the same space or time; corresponding exactly in extent.'" <u>Paselk v. Texas</u>, 2013 WL 6187005, at *6 (E.D. Tex. Nov. 26, 2013) (quoting THE NEW OXFORD AMERICAN DICTIONARY 331 (2001)); see also, <u>Chotkowski v. State</u>, 690 A.2d 368, 385 (Conn. 1997) (quoting Webster's Third New International Dictionary for the proposition that "'[c]oextensive' is defined as 'having the same scope or boundaries'").

Second, Plaintiffs cite no case from any court in Tennessee that recognizes a right to publicity in sports broadcasts. Even if they could point to such a case, the Tennessee Supreme Court has stated that "'[w]hen there is a conflict between the common law and a statute, the provision[s] of the statute must prevail.'" <u>House v. Edmondson</u>, 245 S.W.3d 372, 380 n.7 (Tenn. 2008) (quoting <u>Lavin v. Jordon</u>, 16 S.W.3d 362, 368 (Tenn. 2000)).

It is no answer, as Plaintiffs argue, that (1) "at least seven years earlier than the enactment of the TPRPA," courts recognized the existence of a common law right to publicity; (2) "where a common law tort has been recognized by courts prior to the enactment of a companion statute, 'the Legislature is presumed aware of this prior recognition'"; (3) "'where the remedies subsequently provided by the [Act] are not expressly stated to be exclusive, then the statutory remedies must be considered cumulative'"; and (4) "the TPRPA states that the remedies it provides 'are cumulative and shall be in addition to any others provided by law.'" (Docket No. 257 at 5-6, quoting, <u>Guay v. Mutual of Omaha, Ins. Co.</u>, 79 S.W.3d 528, 536 (Tenn. 2002) & Tenn. Code Ann. § 47-25-1106(e)).

9

The very case on which Plaintiffs rely prefaces its remarks by indicating that the "primary task in construing a statute is to give effect to the intent and purpose of the General Assembly 'without unduly restricting or expanding a statute's coverage beyond its intended scope.'" Guay, 79 S.W.3d at 536 (citation omitted). Furthermore, State ex rel. Presley, on which Plaintiffs rely for the proposition that the common law right to publicity existed years before enactment of the TPRPA , acknowledged that "[w]hile Tennessee's courts are capable of defining the parameters of the right of publicity on a case by case basis, the General Assembly also has the prerogative to define the scope of this right [and] undertook to do so in 1984 when it enacted" the TPRPA, 733 S.W.2d at 99.[7] In exercising that prerogative, the General Assembly specifically defined the right of publicity as it relates to sports broadcast (as discussed in more detail below), something which apparently had not been addressed by the courts in this state before.

Even if Tennessee's common law and statutory rights to publicity are not coextensive as that term is commonly understood, and even if the General Assembly did not effectively delimit the law regarding the right to publicity of sports broadcast, the first two Causes of Action in Plaintiff's Complaint are bound to be dismissed. This is because Plaintiffs' allegations do not set forth a plausible claim for relief, either under the common law or the TPRPA.

As noted, Plaintiffs' cite no Tennessee authority for the proposition that participants in sporting events have a right to publicity under the common law. This is unsurprising since it appears virtually all courts in jurisdictions that have decided the matter under their respective laws have held

---

[7] The Court in State ex rel. Presley also stated that nothing in the TPRPA "should be construed to limit vested rights of publicity that were in existence prior to the effective date of the act" because "[t]o do so would be contrary to Article I, Section 20 of the Tennessee Constitution." Id. However, it is likely that, when the statute was enacted, none of the Plaintiffs were yet born, and most certainly not college athletes, since all Plaintiffs are alleged to have played either college football or college basketball between the 2008 and 2013 seasons.

to the contrary for a variety of reasons.  See, e.g., <u>Dryer v. Nat'l Football League</u>, 55 F. Supp.3d 1181, 1195-1200 (D. Minn.  2014) (holding that (1) NFL's use of video footage of players in games was entitled to First Amendment protection, outweighing players' rights to publicity; (2) programs fell within "newsworthiness" exception under various state's right of publicity laws, and (3) plaintiffs' "play in the NFL was and continues to be the subject of public interest");  <u>Nat'l Football League v. Alley, Inc.</u>, 624 F. Supp. 6, 10 (S.D. Fla. 1983) (no common law violation of right to publicity where use of "player's professional personalities has not been shown to be an advertising use," and no violation of statutory rights where players' consented and "individual's name and likeness" did not "directly promote[] a commercial product or service"); <u>Gionfriddo v. Major League Baseball</u>, 114 Cal. Rptr.2d 307, 313 & 315 (Cal. App. 2001) ("common law right does not provide relief for every publication of a person's name or likeness," and where defendant "is simply making historical facts available to the public through game programs, Web sites and video clips . . . the recitation and discussion of factual data concerning the athletic performance of these plaintiffs commands a substantial public interest, and, therefore, is a form of expression due substantial constitutional protection").

The sole exception to this line of authority appears to be <u>In re NCAA Student Athlete Name and Likeness Litig.</u>, 37 F. Supp.3d 1126 (N.D. Cal. 2014), which Plaintiffs cite for the proposition that "[r]ecent precedent specifically affirms that collegiate athletes have recognizable right of publicity related to sports broadcasts."  (Docket No. 257 at 8).   The only value that case has for present purposes, however, is that there *might* be a right of publicity under Minnesota law for sports broadcast, itself a dubious proposition given a more recent interpretation of that state's caselaw.

<u>In re NCAA Student-Athlete</u> involved 23 current and former student athletes who played at

11

the Division I level beginning in 1953. The sole issue presented in that opinion[8] was whether the NCAA violated federal antitrust law by conspiring to restrain competition in the market for the commercial use of the players' names, images and likeness. In addressing that issue, the court found it necessary to "discuss the scope of student-athletes' publicity rights" in the context of "whether those rights could, absent the challenged restraint, give rise to a market for group licensing," but pointedly repeated that "[t]he court does not analyze the viability of Right-of-Publicity Plaintiffs' claims which remain stayed[.]" Id. at 1140 n. 6. Nevertheless, the court noted that "the NCAA has not shown that each of the named Plaintiffs is, in fact, domiciled in a state that refuses to recognize an athlete's right of publicity in live broadcasts of sporting events," that two of the named plaintiffs "are domiciled in Minnesota," and that "recent case law suggests that athletes may bring such claims under Minnesota law to recover for the unauthorized use of their names and images in at least certain kinds of broadcast footage." Id. at 1146, citing Dryer v. Nat'l Football League, 689 F. Supp. 2d 1113, 1123 (D. Minn. 2013).

The court's statements in In re NCAA Student Athlete about the right to publicity in sports broadcasts are clearly dicta. Moreover, Plaintiffs' right of publicity claims here are based exclusively on Tennessee law, and Defendants argue (and Plaintiffs do not dispute) that the plaintiffs in In re NCAA Student Athlete conceded that Tennessee recognizes no right of publicity in sports broadcasts. Additionally, the Dryer court issued a subsequent opinion in which it held that plaintiffs did not establish that the NFL's use of video footage in television productions violated their

---

[8] That same court, after a bench trial, found that certain "NCAA rules unreasonably restrain trade in the market for certain educational and athletic opportunities offered by NCAA Division I schools," and that "[t]he procompetitive justifications that the NCAA offers do not justify this restraint and could be achieved through less restrictive means." O'Bannon v. NCAA, 7 F. Supp. 3d 955, 963 (N.D. Cal. 2014). Again, the NCAA is not a Defendant in this action.

publicity rights under Minnesota law, nor, for that matter under New York, New Jersey, California, or Texas law.  Dryer, 55 F. Supp.3d at 1195-1200.[9]  Thus, the decision in In re Student Athlete is of no real help to Plaintiffs in establishing an individual participant's right of publicity in a sports broadcast under any state's laws, let alone under Tennessee law.

Plaintiffs' statutory claim fares no better.  In general, the TPRPA provides:

> Any person who knowingly uses or infringes upon the use of another individual's name, photograph, or likeness[10] in any medium, in any manner directed to any person other than such individual, as an item of commerce for purposes of advertising products, merchandise, goods, or services . . . without such individual's prior consent, or, in the case of a minor, the prior consent of such minor's parent or legal guardian . . . shall be liable to a civil action.

Tenn.Code Ann. § 47–25–1105(a) (footnote added).

Tellingly, the TPRPA speaks in terms of the use of an individual's name, photograph, or likeness "for purposes of advertising products, merchandise goods or services."  Id.; see Clark v. Viacom Intern., Inc., 2014 WL 1934028, at *15-16 (M.D. Tenn. May 13, 2014) (citation omitted) (stating that "'[o]nly the use of an individual's identity in advertising infringes on the persona,'" and finding plaintiff right of publicity claim failed where he "fail[ed] to allege that defendants' "statements used his name in connection with any advertisement"); Apple Corps, 843 F. Supp. at

---

[9]  The Court notes that while this opinion was in its final draft, the Eighth Circuit addressed the approval of a settlement for players who remained a part of the class action in Dryer.  In so doing, the court noted that "[t]he district court carefully and thoughtfully considered the strength of the plaintiffs' case and all of the potential risks they would face by continuing to litigate."  Marshall v. NFL, 2015 WL 2402344, at *11 (8th Cir. May 21, 2015).  It noted that the three plaintiffs "who opted out of the settlement and proceeded to the merits of their claims had their claims entirely dismissed by the district court," and that "the district court rejected every single one of the plaintiffs' claims under every state law and under every single theory and defense."  Id.  While the merits of the claims were not before the Eighth Circuit, that court observed the "district court's order is nevertheless strong evidence that it meant what it said in its order approving the settlement regarding the likelihood of success on the merits."  Id.

[10]  "Likeness" is defined in the Act as "the use of an image of an individual for commercial purposes." Tenn. Code Ann. § 47–25–1102(3).

13

347 (the "Tennessee legislature . . . has narrowed the common law prohibition, proscribing only the unauthorized use of another's name or likeness in advertising"). The Act also specifically states that "[i]t is deemed a fair use and no violation of an individual's rights shall be found, for purposes of this part, if the use of a name, photograph, or likeness is in connection with any news, public affairs, or sports broadcast or account." Tenn. Code Ann. § 47-25-1107(a). Thus, the TPRPA clearly confers no right of publicity in sports broadcast, or with respect to any advertisement if the advertisement is in connection with such a broadcast.

At the hearing on the Motions to Dismiss, Plaintiffs' counsel argued that the sports broadcast defense under the TPRPA "does not immunize defendants from liability here because they are using Plaintiffs' images during broadcasts to advertise products that are completely unrelated to sports broadcast[s]." (Transcript, Docket No. 280 at 42). However, they do not plead specific facts which show that any of their names, images, or likenesses have been used in any advertisement, nor do they specify which Defendant(s) created and placed the advertisement, or in what medium it was placed. See Moore, 2012 WL 14884758, at *30 (citation omitted) ("The TPRPA is 'narrowly drawn' to have a particular scope, 'proscribing only the unauthorized use of another's name or likeness in advertising'"); Gauck, 805 F. Supp.2d at 502 (plaintiffs must "demonstrate[] a causal connection between the defendants' use of their persona and a direct, non-incidental benefit to the defendants from that use); McKee v. Meltech, Inc., 2011 WL 1770461, at * 12 (W.D. Tenn. May 9, 2011) (complaint failed where nothing suggested that defendant's used plaintiff's "likeness for advertising or endorsement purposes").

Thus far, the Court has concluded that the statutory and common law right to publicity are co-extensive under Tennessee law, that the common law in Tennessee does not recognize a

14

individual participant's right to publicity in sports broadcasts, and that, in any event, the TPRPA circumscribes whatever rights may exist under the common law insofar as sports broadcast are concerned. Nevertheless, a couple of further points need to be addressed in order to give full consideration to Plaintiffs' right to publicity arguments.

Plaintiffs rely on <u>Zacchini v. Scripps-Howard Broad. Co.</u>, 433, U.S. 562 (1977) and <u>Wisconsin Interscholastic Athl. Ass'n v. Gannett Co., Inc.</u>, 658 F.3d 614 (7th Cir. 2011) to support their right of publicity claims, and to defend against any contention that the First Amendment bars such claims in the context of sports broadcasts. They argue that, like the plaintiff in <u>Zacchini</u>, they do "'not seek to enjoin the broadcast of [their] performance but simply want[] to be paid for it[.]'" (Docket No. 257 at 2, citation omitted). The key to those cases, Plaintiffs insist, is the distinction drawn between reporting about sports events, as opposed to broadcasting entire sporting event, with the former being protected as newsworthy and of public interest, and the latter not.

There is no doubt that <u>Zacchini</u> and <u>Wisconsin Interscholastic</u> draw the distinction made by Plaintiffs in this case, and the court in <u>In re NCAA Student-Athlete</u> relied on that distinction in holding that "the First Amendment does not guarantee media organization an unlimited right to broadcast entire college football and basketball games." <u>In re NCAA Student-Athlete</u>, 37 F. Supp.2d at 1142. But, stating that the First Amendment does not guarantee unlimited broadcast rights does not mean that it correspondingly establishes a right to publicity by the athletic participants when entire games are broadcast. Moreover, just as with all cases, <u>Zacchini</u> and <u>Wisconsin Interscholastic</u> must be read in context and, when so read, are inapposite.

Hugo Zacchini was a "human cannonball" who performed the feat of being shot from a cannon into a net 200 feet away. In the summer of 1972, he performed his act at a county fair in

15

Ohio and, over his protest, a local new reporter filmed the entire 15-second performance, which was then broadcast on the local eleven o'clock news. Mr. Zacchini brought an "action for damages, alleging that he is 'engaged in the entertainment business,'" and asserted that defendant "'showed and commercialized the film of his act without his consent,' and that such conduct was an 'unlawful appropriation of [his] professional property.'" 433 U.S. at 564.

Unlike the situation here, Mr. Zacchini was not only a performer, he was also the producer of his one-man show and, as a consequence, "Ohio's decision to protect [his] right of publicity here rests on more than a desire to compensate the performer for the time and effort invested in his act; the protection provides an economic incentive for him to make the investment required to produce a performance of interest to the public." Id. at 576. The Supreme Court went on to observe that "[t]his same consideration underlies the patent and copyright laws long enforced by this Court," laws that "were 'intended definitely to grant valuable, enforceable rights' in order to afford greater encouragement to the production of works of benefit to the public." Id. at 576-77. It is a mistake, the Court believes, to read Zacchini as supporting a right of publicity by anyone who performs in an event produced by someone else.

Wisconsin Interscholastic involved a high school athletic association's challenge to the streaming of a tournament game by news organizations in violation of exclusive licensing agreements entered into between the association (which sponsored the tournaments) and a video production company. On its face that case does not aid Plaintiffs because the Seventh Circuit affirmed the association's right to enter into exclusive contracts for broadcasting entire games, noting that "tournament games are a performance product of [the association] which it has a right to control." 658 F.3d at 616. True, the court stated that "[t]he distinction between coverage or

16

reporting on the one hand, and broadcast of an 'entire' act on the other hand, was central to Zacchini," but the court also observed that Zacchini stands for a second proposition: "Zacchini makes clear that the producer of entertainment is entitled to charge a fee in exchange for consent to broadcast; the First Amendment does not give the media the right to appropriate, without consent or remuneration, the products of others." Id. at 624.

Here, Plaintiffs are the players in broadcast football and basketball games. The networks are the producers and the games are their products.

In their reply brief, Plaintiffs assert that they, "and the majority of Student Athletes are African American," and argue that "the sports broadcast exception, if applied . . . would adversely impact a suspect class disproportionately." (Docket No. 257 at 8). Plaintiffs continue:

> Since the TPRPA's sports broadcast exception serves to limit fundamental rights protected under the Tennessee Constitution, it is subject to strict scrutiny under state law. . . . Further, the exception creates a separate classification of persons with a right to publicity. Where the classification at issue "(1) operates to the peculiar disadvantage of a suspect class; or (2) interferes with the exercise of a fundamental right," strict scrutiny applies."

(Id. at 9, citation omitted).

If for no other reasons, Plaintiffs' constitutional challenge is subject to dismissal because no facts are alleged in the Complaint to support such a claim, nor is any such cause of action asserted. Moreover, Plaintiffs have not shown compliance with the notice requirements Rule 5.1 of the Federal Rules of Civil Procedure for a constitutional challenge to a state statue. Regardless, Plaintiffs' constitutional claim fails on the merits.

Article I, section 8 of the Tennessee Constitution provides "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the

17

law of the land," Tenn. Const. art. I, § 8, with "law of the land" being synonymous with "due process of law" under the Fifth and Fourteenth Amendments to the United States Constitution. Mansell v. Bridgestone Firestone No. Am. Tire, LLC, 417 S.W.3d 494, 407 (Tenn. 2013). "Accordingly, unless a fundamental right is implicated, a statute comports with substantive due process if it bears 'a reasonable relation to a proper legislative purpose' and is 'neither arbitrary nor discriminatory.'" Gallagher v. Elam, 104 S.W.3d 455, 463 (Tenn. 2003).

In addition, the Tennessee Constitution, like that of the United States, guarantees all citizens the equal protection of the law, meaning that "'all persons similarly circumstanced shall be treated alike.'" Newton v. Cox, 878 S.W.2d 105, 109 (Tenn. 1994) (quoting Tenn. Small School Sys. v. McWherter, 851 S.W.2d 139,153 (Tenn. 1993)). With regard to equal protection challenges, the Tennessee Supreme Court has stated:

> this Court has adopted an analytical framework similar to that used by the United States Supreme Court in analyzing equal protection challenges. . . . Under this framework, one of three standards of scrutiny applies, depending upon the nature of the right asserted or the class of persons affected: (1) strict scrutiny; (2) heightened scrutiny; or (3) reduced scrutiny, applying the rational basis test. . . . Strict scrutiny applies when the classification at issue: (1) operates to the peculiar disadvantage of a suspect class; or (2) interferes with the exercise of a fundamental right.

Gallagher, 104 S.W.3d at 463.

Whether grounded in the due process clause or the equal protection clause, Plaintiffs' assertion that the TPRPA is subject to strict scrutiny fails because they have not adequately argued, let alone pled, that the statute operates to the peculiar disadvantage of a suspect class or that it interferes with a fundamental right.

It is difficult to perceive how a facially neutral statute that creates exemptions for news, public affairs and sports broadcasts singles out a specific class, and Plaintiffs do not suggest how

18

that could be so. Even within the world of sports, the statute does not target specific types of broadcasts such as football or basketball, or even just athletes as opposed to the countless others whose name and images might appear in such broadcasts. Yet to prevail on an equal a claim, Plaintiffs would have to "prove the existence of a racially discriminatory purpose behind the statute," Wilson v. Collins, 517 F.3d 421, 432 (6th Cir. 2008), something which Plaintiffs do not even allege.

Nor have Plaintiffs alleged that the TPRPA impacts a fundamental right. Fundamental rights are rights "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (citations and quotations omitted). As can be expected, "[t]he list of liberty interests and fundamental rights 'is short, and the Supreme Court has expressed very little interest in expanding it.'" EJS Prop., LLC v. City of Toledo, 698 F.3d 845, 860 (6th Cir. 2012) (quoting Seal v. Morgan, 229 F.3d 567, 574-75 (6th Cir. 2000)). "In addition to the specific freedoms protected by the Bill of Rights," fundamental rights include such thing as the right to marry; have children (and direct their education and upbringing); to marital privacy; to use contraception; to bodily integrity, and to an abortion. Glucksberg, 521 U.S. at 720.

The ability to profit from a right of publicity simply does not rise to the level of a fundamental right. While Plaintiffs cite cases for the proposition that fundamental rights "include the right to privacy," (Docket No. 257 at 7), as the Network Defendants correctly observe, an "athlete who takes the field before 100,000 fans at Neyland Stadium can hardly claim that a broadcast of the game threatens any constitutionally protected 'privacy right.'" (Docket No. 269 at 7).

19

In the absence of the deprivation of a fundamental right or intentional discrimination against a suspect class, a statute is entitled to rational basis review which is exceedingly deferential. The Sixth Circuit has explained:

> Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government purpose. There is a strong presumption of constitutionality and the regulation will be upheld so long as its goal is permissible and the means by which it is designed to achieve that goal are rational. . . . . "This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." . . . "Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." . . . . Finally, under rational basis review, the government "has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'"

Liberty Coins, LLC v. Goodman, 748 F.3d 682, 693-94 (6th Cir. 2014) (internal citations omitted). Moreover, "[t]hose seeking to invalidate a statute using rational basis review must 'negative every conceivable basis that might support it.'" Craigmiles v. Craig, 312 F.3d 220, 224 (6th Cir. 2002) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)). The TPRPA passes that review if for no other reason than it is related to the legitimate goal of avoiding unreasonable impediments to the broadcasting of important matters of public interest, including sporting events.

Finally, the Court notes that the parties advance numerous authorities to support their respective positions that Section 301(a) of the Copyright Act either does, or does not, preempt Plaintiffs' right of publicity claims. In light of this Court's conclusion that Plaintiffs fail to state a claim under either Tennessee's common law or the TPRPA, the Court declines to consider the matter. See Casias v. Wal-Mart Stores, Inc., 695 F.3d 423, 437 n.1 (6th Cir. 2012) (declining to address whether federal law preempted state statute where plaintiff failed to state a claim under the statute); Andretti v. Borla Performance Indus., Inc., 426 F.3d 824, 829 (6th Cir. 2005) (refusing to

20

address copyright preemption and standing arguments where plaintiff could not establish damages).

**B.  Section One of the Sherman Act – Fourth Cause of Action**

Under the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1.  "For a plaintiff to successfully bring an antitrust claim under Section 1 of the Sherman Act, the plaintiff must establish that the defendant's actions constituted an unreasonable restraint of trade which caused the plaintiff to experience an antitrust injury." In re Se. Milk Antitrust Litig., 739 F. 3d 262, 270 (6th Cir. 2014).   Plaintiffs have failed to adequately allege either element.

"A Section One complaint will survive a Rule 12(b)(6) motion to dismiss if it alleges facts sufficient to raise a plausible inference of an unlawful agreement to restrain trade."  Erie Cnty. v. Morton Salt, Inc., 702 F.3d 860, 869 (6th Cir. 2012).  "To survive a motion to dismiss, these allegations must be specific enough to establish the relevant "who, what, where, when, how or why." Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 445 (6th Cir. 2012).  "To plead unlawful agreement, a plaintiff may allege either an explicit agreement to restrain trade, or 'sufficient circumstantial evidence tending to exclude the possibility of independent conduct.'" Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., 648 F.3d 452, 457 (6th Cir. 2011).

In the Complaint, Plaintiffs attack the NCAA amateurism rules, describing them as anticompetitive agreements.  Beginning in the introductory paragraph, the Complaint alleges that "[t]he defendants – broadcasters, athletic conferences and licensing entities – have conspired with each other and the NCAA to promulgate, enforce, adopt, implement and/or exploit rules that are inherently anticompetitive in forbidding Student Athletes from competing in the marketplace for the value of their rights of publicity." (Docket No. 1, Complaint Intro. Para.).  This theme underlies the

21

entire Complaint, and is carried over to the "Background of the Anticompetitive Restraints" section, in which Plaintiffs allege, among other things, that "[s]ince its inception, the NCAA has gradually evolved into an environment that exploits its member athletes, all in the name of amateurism." (Id. at ¶ 94).

The Conference Defendants are alleged to "jointly enforce this clear demarcation between Student Athletes and professional athletes by permitting only 'amateur' Student Athletes to participate in intercollegiate sports," and have not only approved the NCAA's rules, but have mandated that its members follow those rules. (Id. ¶¶ 98, 102-103). The claim against the Network Defendants is more attenuated, with the allegation being those Defendants have entered into lucrative contracts with the NCAA and Conference Defendants which "effectively adopt and implement" the restrictive rules and bylaws of the NCAA. (Id. ¶¶ 105, 112). The claim against the Licensing Defendants is thinner still, alleging that "[t]he agreements between the Licensing Defendants and NCAA member institutions purportedly encompass the commercial value of Student Athletes' rights of publicity, yet Licensing Defendants refuse to negotiate or enter into agreements with Student Athletes to obtain such rights." (Id. ¶ 123).

By necessarily linking their antitrust claims to the NCAA amateurism rules and attacking those rules, Plaintiffs are faced with a fundamental problem, notwithstanding that the NCAA is not a Defendant in this action. Their attack runs counter to a line of cases which have addressed the amateurism rules in a variety of circumstances, including <u>NCAA v. Board of Regents</u>, 468 U.S. 85 (1984), decided more than thirty years ago.

<u>Board of Regents</u> involved an antitrust challenge to an NCAA plan to limit the number of football games Division I schools were allowed to televise each season in order to "reduce, insofar

22

as possible, the adverse effects of live television upon football game attendance." Id. at 94. Applying the rule of reason (as opposed to the *per se* rule) for antitrust challenges, the Supreme Court found that the plan violated Section One of the Sherman Act because it constituted illegal price fixing and established unlawful horizontal market restraints.

However, in arriving at its conclusion, the Supreme Court stated that "the role of the NCAA must be to preserve a tradition that might otherwise die." Id. at 120. The Court also made a couple of salient observations:

> What the NCAA and its member institutions market in this case is competition itself – contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete. Moreover, the NCAA seeks to market a particular brand of football—college football. The identification of this "product" with an academic tradition differentiates college football from and makes it more popular than professional sports to which it might otherwise be comparable, such as, for example, minor league baseball. In order to preserve the character and quality of the "product," athletes must not be paid, must be required to attend class, and the like. And the integrity of the "product" cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed. Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result enables a product to be marketed which might otherwise be unavailable. In performing this role, its actions widen consumer choice – not only the choices available to sports fans but also those available to athletes – and hence can be viewed as procompetitive.

Id. at 101-02. The Court also wrote:

> The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act.

Id. at 119.

Here, of course, Plaintiffs were subject to the NCAA's eligibility rules, and in <u>Smith v. NCAA</u>, 139 F.3d 180, 189 (3rd Cir. 1998), the Third Circuit observed that the Supreme Court in <u>Board of Regents</u> "did not comment directly on whether the Sherman Act" would apply to those rules. Nevertheless, after noting that no court of appeals had expressly addressed the issue but numerous lower courts had, the Third Circuit "agree[d] with th[o]se court that the eligibility rules are not related to the NCAA's commercial or business activities," and, as a consequence, held that "the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements." <u>Id</u>. at 185-86.

<u>Smith</u> is not controlling and, as Plaintiffs argue, the language in <u>Board of Regents</u> about amateurism and players not being paid may well be *dicta*. Still, that language cannot be blithely ignored.

To the contrary, <u>Board of Regents</u> has recently been read to mean that "most [NCAA] regulations will be 'a justifiable means of fostering competition among amateur athletic teams,' and are therefore procompetitive." <u>Agnew v. NCAA</u>, 683 F.3d 328, 341 (7th Cir. 2012) (quoting <u>Bd. of Regents</u>, 468 U.S. at 117). It also has been read as giving courts "a license to find certain NCAA bylaws that 'fit into the same mold' as those discussed in <u>Board of Regents</u> to be procompetitive 'in the twinkling of an eye,' – that is, at the motion-to-dismiss stage." <u>Id</u>. (quoting <u>Bd. of Regents</u>, 468 U.S. at 110 n.39). "Accordingly, when an NCAA bylaw is clearly meant to help maintain the 'revered tradition of amateurism in college sports' or the 'preservation of the student-athlete in higher education,' the bylaw will be presumed procompetitive, since [a court] must give the NCAA 'ample latitude to play that role.'" <u>Id</u>. at 342-34 (quoting <u>Bd. of Regents</u>, 468 U.S. at 120).

Like <u>Smith</u>, <u>Agnew</u> is not controlling, but the Sixth Circuit, too, has addressed whether an

NCAA eligibility rule should be deemed commercial for purposes of an antitrust challenge. In Bassett v. NCAA, 528 F.3d 426 (6th Cir. 2008), a former college coach brought a complaint which alleged, among other things, that the NCAA's enforcement of its recruiting and improper inducement rules violated the Sherman Act. Finding no violation, the Sixth Circuit noted that, for the Sherman Act to apply, the challenged action must be commercial in nature, and that cases like Smith draw the distinction between rules which provide a commercial advantage and those that seek to ensure fair competition in college sports.

The "appropriate inquiry is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'" Id. at 433 (quoting Worldwide Basketball & Sport Tours, Inc. v. NCAA, 388 F.3d 955, 958 (6th Cir. 2004)). Finding that the complaint lacked "the critical commercial activity component required to permit application of the Sherman Act," the court affirmed dismissal, writing:

> Similar to the eligibility rules in Smith, NCAA's rules on recruiting student athletes, specifically those rules prohibiting improper inducements and academic fraud, are all explicitly non-commercial. In fact, those rules are anti-commercial and designed to promote and ensure competitiveness amongst NCAA member schools. Violation of the applicable NCAA rules gives the violator a decided competitive advantage in recruiting and retaining highly prized student athletes. It also violates the spirit of amateur athletics by providing remuneration to athletes in exchange for their commitments to play for the violator's football program. . . .

Id. at 433; see also, Gaines v. NCAA, 746 F. Supp. 738, 744 (M.D. Tenn. 1990) ("The overriding purpose of the eligibility rules . . . is not to provide the NCAA with commercial advantage, but rather the opposite extreme – to prevent commercializing influences from destroying the unique 'product' of NCAA college football").

The same conclusion must be reached here. Right or wrong, under NCAA rules, other than the requirement that an athlete be a student, there can be no more basic eligibility rule for

amateurism than that the athlete not be paid for playing his or her sport.

Notwithstanding the allegations in the Complaint, Plaintiffs argue in their response brief to the Licensing Defendants' Motion to Dismiss that "the amateurism rules that preclude Student Athlete Compensation are not the restraint at issue." (Docket No. 259 at 1). Rather, "the restraints at issue include, but are not limited to, the multi-million dollar broadcast contract and multi-media agreements that purport to transfer the right to use the [names and likeness] of Student Athletes." Id. Their attempt to distance themselves from a fundamental, underlying premise of their case only trades one problem for another.

To have standing to pursue any claim, an aggrieved party must suffer an injury-in-fact. "A plaintiff suffers an 'injury in fact' when his legally protected interest has been invaded[.]" Kiser v. Reitz, 765 F.3d 601, 607 (6th Cir. 2014). Here, Plaintiffs claim injuries because of their exclusion from a broadcasting marketplace in which they do not (or did not) get paid. However, the Court has concluded that, as a matter of law, Plaintiffs do not have a right to publicity in sports broadcasts. Because Plaintiffs do not have a right to publicity under Tennessee law – the very basis of their claim that they have a right to be paid for appearing in television broadcasts of games and in advertisements for such broadcasts – they cannot plead any antitrust injury.[11]   And, they cannot have been injured by a purported conspiracy to deny them the ability to sell non-existent rights. See Square D Co. v. Niagara Frontier Tariff Bur., Inc., 476 U.S. 409, 416 (1986) ("Injury implies

---

[11] Plaintiffs argue that the Conference Defendants are mistaken when they assert that the absence of an enforceable right of publicity under Tennessee law is fatal to Plaintiffs' antitrust claim. Plaintiffs' point out that "the proposed Class includes Student Athletes from every state," and assert that "[t]he anticompetitive restraint at issue is national in character – the anticompetitive effects of which are palpable in every state in the country." (Docket No. 258 at 6). That may be so, but the only right of publicity pled is under Tennessee law. It is not this Court's duty to scour or canvass the law of every jurisdiction in order to determine whether Plaintiffs have stated a viable claim.

violation of a legal right.").

Moreover, "[b]ecause protecting competition is the *sine qua non* of the antitrust laws," <u>Care Heating and Cooling Inc. v. Am. Std., Inc.</u>, 427 F.3d 1009, 1014-15 (6th Cir. 2005), "[a] private antitrust plaintiff, in addition to having to show injury-in-fact and proximate cause, must allege, and eventually prove, 'antitrust injury.'" <u>In re Cardizem CD Antitrust Litig.</u>, 332 F.3d 896, 909 (6th Cir. 2003). Antitrust injury is an "injury of the type the antitrust laws were intended to prevent" and one "that flows from that which makes defendants' acts unlawful." <u>Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.</u>, 429 U.S. 477, 489 (1977).

"[T]he antitrust injury doctrine is designed to ensure that 'the injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" <u>In re Cardizem</u>, 332 F.3d at 909 (quoting <u>Brunswick Corp.</u>, 429 U.S. at 489 (1977)). "'The Supreme Court has further explained the requirement as ensur[ing] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place,' and, more specifically, it 'ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.'" <u>Id.</u> (quoting <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 342-343 (1990)). "The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation." <u>Ky. Speedway LLC v. National Ass'n of Stock Car Auto Racing</u>, 588 F.3d 908, 920 (6th Cir. 2009); <u>Valley Prods., Inc. v. Landmark</u>, 128 F.3d 398, 403 (6th Cir. 1997)).

Undoubtedly, there is stiff competition among the conferences to secure air time for games,

among the networks to broadcast those games, and among the licensors to market college games, and Plaintiffs' allegations suggests as much. Maybe a market where players get paid would result in more competition, or at least vastly different competition. However, Plaintiffs fail to show how Defendants' behavior (most particularly that of Network and Broadcast Defendants), in complying with NCAA rules, can be said to be the cause of reduced competition and any concomitant antitrust injury. See In re Canadian Import Antitrust Litig., 470 F.3d 785, 792 (8th Cir. 2006) (antitrust complaint properly dismissed where plaintiffs alleged they were injured by increased prices for prescription drugs because they were unable to import less expensive drugs from Canadian pharmacies, but prohibition was based upon regulatory scheme of the government, not the conduct of the defendants).

Accordingly, Plaintiffs' antitrust claim under Section One of the Sherman Act must be dismissed.

## C. False Endorsement Under the Lanham Act – Fifth Cause of Action

For their Fifth Cause of Action, Plaintiffs bring a false endorsement claim against the Network and Licensing Defendants. Specifically, they claim:

> 178. Broadcast and Licensing Defendants have used, and continue to use, thousands of Class Members' names, images, and likenesses in connection with their advertisements for nationally televised airings of FBS football and NCAA Division I basketball games, for the explicit purpose of promoting the airings, increasing their brand awareness, and driving revenue to the Broadcast and Licensing Defendants.

> 179. Broadcast and Licensing Defendants have used, and continue to use, thousands of Class Members' names, images, and likenesses in the nationally televised airings of FBS football and NCAA Division I basketball games.

> 180. The names, images, and likenesses of many Class Members that Broadcast and Licensing Defendants use to promote their products are highly recognizable to consumers deciding whether to watch or order the Broadcast and Licensing Defendants' broadcasts of FBS football and Division I basketball games. FBS

28

football and Division I basketball players also wear uniforms, and numbers, making them easily identifiable to consumers.

181. Broadcast and Licensing Defendants' use of Class Members' images in advertisements and nationally televised airings of FBS football and Division I basketball games has caused actual confusion among members of the public as to Class Members' support and endorsement of Defendants' broadcasts.

182. The use of Class Members' images in Broadcast and Licensing Defendants' advertisements and televised airings constitutes a false endorsement in violation of Plaintiffs; and Class Members' rights under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

(Docket No. 1, Complaint ¶¶ 178-182).

Section 43(a)(1)(A) of the Lanham Act states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term name, symbol, or device, or any combination thereof . . . ,

which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that her or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). For two reasons, neither of which need be discussed in great detail given the ground that has already been plowed, Plaintiffs' Lanham Act claim must be dismissed.

First, "[t]he Lanham Act is constitutional because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment." Taubman Co. v. Webfeats, 319 F.3d 770, 774 (6th Cir. 2003) (citing Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York, 447 U.S. 557, 563 (1980)). "Commercial speech" is generally "speech that does no more than propose a commercial transaction[.]" United States v. United Foods, 535 U.S. 405, 409 (2001).

29

Broadcasting sporting events does not "propose a commercial transaction." Rather, it depicts a real event and distributes desired speech (sports programming) to the public, and, thus, it is not "commercial speech" for purposes of First Amendment jurisprudence. See, Dryer, 55 F. Supp.3d at 1184-87 (clips of game footage are protected by the First Amendment because they are noncommercial speech and convey factual information about football games).

Second, Plaintiffs fail to adequately allege likelihood of confusion, which is "the controlling issue" for the ordinary "false endorsement claim[.]" ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 925 (6th Cir. 2003). "False endorsement occurs when a celebrity's identity is connected with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service." Id. at 925-26.

Plaintiffs' Complaint centers on the broadcast of sporting events, specifically, the airing of college football and basketball games. They merely allege that they played in games that were shown on television, and that advertisements appeared in the broadcast of the games. They plead no specific facts indicating when any of their images were used and, if so, by whom.

At the hearing on the Motions to Dismiss, Plaintiffs' counsel played a video clip from a St. John University versus San Diego State University tournament basketball game. The clip captured a player preparing to shoot a free-throw, while an advertisement for an upcoming television program appeared on the bottom of screen.

None of the present Plaintiffs are alleged to have played ball at either university. Regardless, it is simply implausible to conclude that the shooter or those along the key were in anyway endorsing the upcoming program, any more than Tennessee Titans players, their opponents, or spectators endorse Louisiana-Pacific building products (or, indeed, any of the host of other products

30

displayed on the scoreboard) when games are played at LP field, even though such advertisements may be captured in the background during the game.

The broadcasts Plaintiffs complain about show football players or basketball players playing their sport. There is no confusion about what they are doing. Accordingly, their Lanham Act claim is subject to dismissal.

**D. Civil Conspiracy, Unjust Enrichment & Accounting – Third, Sixth and Seventh Causes of Action**

In light of the foregoing conclusions, all of Plaintiffs' remaining claims must be dismissed. Their civil conspiracy claim is linked to their right to publicity, Sherman Act, and Lanham Act claims, none of which survive; their unjust enrichment claims is based upon the alleged "unlawful agreements, contracts, combinations, and conspiracy"; and their request for accounting seeks an accounting to the extent that Defendants' unlawfully "misappropriated" their names, likenesses, and images.

### III. **Conclusion**

College basketball and football, particularly at the Division I and FBS levels, is big business. Of that there can be little doubt. Many believe that "amateur" when applied to college athletes today is a misnomer – an artificial label and anathema, placed on players, like Plaintiffs, whose efforts on the court and field lead to untold riches for others, such as Defendants. Cogent arguments have been raised that it is time Student Athletes share in the bounty, above and beyond any scholarships they may receive.

In this case, however, the Court is not called upon to address the larger picture of whether, as a matter of recognition, equity or fundamental fairness, Student Athletes should receive "pay for play." Nor is it the Court's task to pass on the wisdom of the NCAA's eligibility rules that bar compensation, or whether those rules capture reality, given the present nature and environment of college sports. The Court expresses no opinion on those issues.

Rather, the Court's sole task is to determine whether present Plaintiffs have alleged sufficient facts or stated a viable claim that they are entitled to monetary compensation because they play in televised games. The Court finds that Plaintiffs have not done so under any of the theories that they set forth. Accordingly, the Motions to Dismiss filed by the Network Defendants, the Conference Defendants, and the Licensing Defendants will be granted. Said dismissal will be with prejudice.[12]

---

[12] In their moving papers, Defendants repeatedly request that dismissal of the claims be with prejudice. In the absence of a Motion to Amend, defendants are "'entitled to a review of the complaint as filed pursuant to Rule 12(b)(6)'"; plaintiffs are "'not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.'" La. Sch. Bd. Emps' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 478 (6th Cir. 2010) (quoting Begala v. PNC Bank, Ohio, Nat. Ass'n, 214 F.3d 776, 784 (6th Cir. 2000)). Notwithstanding Defendants' request, Plaintiffs have not moved to amend to cure any deficiencies.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---